```
 1                 IN THE UNITED STATES DISTRICT COURT
                 FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3   UNITED STATES OF AMERICA        )
                                     )
 4                 Plaintiff,        )     CRIMINAL ACTION FILE
                                     )     NO. 1:14-CR-146-ODE
 5   v.                              )
                                     )       ATLANTA, GEORGIA
 6   DESHAWN REILLY                  )
                                     )
 7                 Defendant.        )
     _____)

 8

 9                    TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE ORINDA D. EVANS,
10                  UNITED STATES DISTRICT JUDGE

11                          VOLUME 1
                      Thursday, May 8, 2014
12

13

14

15   APPEARANCES OF COUNSEL:

16   For the Plaintiff:          OFFICE OF THE U.S. ATTORNEY
                                 (By:  John S. Ghose)
17
     For the Defendant:          Steven Howard Sadow
18

19

20

21
            Proceedings recorded by mechanical stenography
22           and computer-aided transcript produced by
                    NICHOLAS A. MARRONE, RMR, CRR
23                    1714 U. S. Courthouse
                      75 Spring Street, S.W.
24                    Atlanta, GA  30303
                         (404) 215-1486
25
```

1                       I N D E X

2    *Witness*                                    *Page*

3    CHRISTA K. MORGAN
            Direct (By Mr. Ghose)                 25
4           Cross (By Mr. Sadow)                  32
            Redirect (By Mr. Ghose)               36
5           Further Cross (By Mr. Sadow)          37

6    CHARLES SEDBERRY
            Direct (By Mr. Ghose)                 39
7           Cross (By Mr. Sadow)                  52

8    RHONDA MARIE AUGUSTINE
            Direct (By Mr. Sadow)                 66
9           Cross (By Mr. Ghose)                  68

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Thursday Morning Session

2              May 8, 2014

3              10:12 a.m.

4              -- -- --

5          P R O C E E D I N G S

6              -- -- --

7      (In open court:)

8      THE COURT:  Good morning, folks.  How are you?

9      Ladies and gentlemen, this is an appeal from a

10  finding by Judge Walker after a detention hearing that she

11  held.

12      I have read the papers.  I have read the transcript

13  of the hearing that she held.  I have seen the exhibits that

14  were admitted into evidence at the hearing.  So we will just

15  take it from there.

16      Mr. Sadow?

17      MR. SADOW:  Good morning, again, Your Honor.

18      THE COURT:  Good morning.

19      MR. SADOW:  I think it's fair to say that

20  Your Honor and I have been doing this long enough that we

21  will skip the preliminaries and go to the things that I think

22  the Court would want to hear.

23      THE COURT:  It has been a while, hasn't it?

24      MR. SADOW:  Well, maybe me longer than you.

25      THE COURT:  Hmm, I don't know.

1          MR. SADOW:  In any event, let me kind of start at

2    the tail end and suggest the conditions of release that we

3    would ask the Court to impose.

4          First would be a $250,000 secured bond, secured by

5    a professional bonding company.

6          Second would be 24-7 home detention.  And when I

7    say 24-7, I mean the only reasons that the defendant is

8    permitted to leave the home is by court permission or to come

9    to my office.  That is, he resides there full-time.

10         He would be residing with his mother-in-law at 7873

11   Heathmore, that's H-e-a-t-h-m-o-r-e, Drive, in Fairburn,

12   Georgia  30213.  His mother-in-law is here.  Her name is

13   Rhonda Marie Augustine.  When I say mother-in-law, that

14   presupposes that the wedding that is set for May 17th is

15   permitted to take place in some form or fashion.

16         In addition, we would have GPS electronic

17   monitoring, which of course is twenty-four hours a day.

18         And I think those are the most stringent conditions

19   one can have.  We would agree to any other conditions that

20   the Court would deem appropriate or that the government might

21   come up with which in turn could have to do with association

22   or anything of that nature with individuals.

23         I recognize based on the detention hearing

24   transcript and the exhibits that there are risk factors that

25   have been identified and I know concern the Court

1    greatly.  We have fake IDs, we have multiple addresses, we

2    have criminal activity in the past and criminal activity that

3    the defendant was on bond for at the time involving

4    marijuana.  We have what turns out to be two pounds of

5    marijuana found at a location or a residence on the day that

6    the defendant is arrested in connection with this case.

7           I recognize all of those, but I ask the Court to

8    consider against that what I think is the most significant

9    factor in this case, which is this is a remarkably weak case,

10   and it is that which I am going to outline by proffer to the

11   Court what we have.

12          We have a situation where prior to March 19th of

13   this year -- and I'm going to put this in a light most

14   favorable to the government -- the defendant, the defendant's

15   fiancee, whose name is Curel Taylor -- C-u-r-e-l Taylor --

16   and I believe another female and another male, possibly two

17   other males, are at the Arrowhead Pawn Shop, and Ms. Taylor,

18   the fiancee, is looking at firearms.  Whether she had decided

19   to buy one firearm or two firearms, she fills out the

20   necessary paperwork for the firearm.

21          A background check has to be run, and at that point

22   in time she leaves the store or the pawn shop waiting to be

23   notified about the background check.

24          An employee of the Arrowhead Pawn Shop, who was

25   identified in the paperwork -- and I will simply refer to him

as, as I understand, Philip -- Philip makes contact with the ATF because he is suspicious of the transaction.

ATF coordinates the pick-up, so to speak, of the firearm or firearms between pawn shop and Ms. Taylor, and recognizes from a telephone used by Ms. Taylor that it is identified with one Deshawn Reilly, the defendant in this case.

Deshawn Reilly they determine is a convicted felon, and ATF now has suspicion that this could be a sham purchase or a straw purchase for Mr. Reilly.

On March the 19th, Mr. Reilly and Ms. Taylor go to the pawn shop.  She indicates that she is going forward with the purchase of at least one of the pistols, an FN pistol, all of which is videotaped.

Now, the magistrate judge did not have the benefit of the videotape.  The videotape has now been turned over to me.

It is approximately 60 minutes in length.  I am not going to ask the Court to look at it at this point, but I will summarize it.

There is no audio.  It's only video.  The interaction between Philip at the pawn shop and Ms. Taylor is clearly shown.  What's not shown, what's not reflected is the audio.

What winds up happening is Philip, the pawn shop

gentleman, suggests that a shotgun be purchased because that would be a real weapon of protection.  There is conversation about the shotgun between Ms. Taylor and Philip, between Mr. Reilly and Philip.

At all this time Ms. Taylor is filling out the paperwork for the gun order, Mr. Reilly can be seen --

THE COURT:  I'm sorry, the paperwork for the --

MR. SADOW:  For the gun -- at this point it's primarily for the FN pistol.  It's not for the shotgun yet.

Mr. Reilly can be seen -- as the conversation is going on, he can be seen pointing at a couple of different shotguns after it was suggested.

They bring the shotguns down, they go to the side of the counter, they show Mr. Reilly the shotguns.  He doesn't touch them.  In fact, you can see at one point one of the people tries to give him the shotgun, and he backs away from it.

Conversation continues.  They now bring the shotgun over and place it in front of Ms. Taylor.  Ms. Taylor -- and you can tell by the way things are going, she's communicating with both Philip and Reilly about the shotgun.  As I understand, the conversation would have to do with how do I use it, how am I going to learn how to use it.  This goes on for a number of minutes.

Mr. Reilly gives --

1          THE COURT:  Does the video have audio on it?

2          MR. SADOW:  No, it does not, which is

3     unfortunate.

4          Mr. Reilly then -- you can see he's on the phone

5     talking to someone.  He hands that phone to Philip, and

6     Philip speaks to that person.  He hands the phone back to

7     Mr. Reilly.  Mr. Reilly then -- there is more interaction.

8          Now the paperwork is being completed.  At that

9     point it's being completed not just on the FN pistol, but on

10    the shotgun.  The phone comes out again -- excuse me.  The

11    phone comes out again, Ms. Taylor's phone, and again there is

12    conversation with Philip and somebody on the phone.

13         What that conversation is is Ms. Riley signing up

14    or making arrangements to take the class, the shooting class

15    on the shotgun, and Philip is on the phone doing this; that

16    is, the guy from the pawn shop.  You can watch this.

17         And now as it's getting ready to pay for the gun,

18    Ms. Reilly pays for both weapons completely.  The money comes

19    out of her purse in the neighborhood of about twenty-seven

20    hundred and change and five hundred dollars in change is put

21    on her debit card.  All of this is right there.

22         At no time does Mr. Reilly attempt to pick the gun

23    up, to touch the gun, to have any contact with the gun

24    itself.

25         Towards the end of the fourth 15-minute period,

1   Ms. Taylor picks the gun up, the shotgun up, and you can see

2   her, she's half on screen and half off screen putting it on

3   her shoulder, feeling the weight of the shotgun, finishes up

4   the purchase.

5          As they are getting ready to walk out, Mr. Reilly

6   is about -- I mean, yes, Mr. Reilly is about to take one of

7   the packages.  Now, in this package is not only the pistol

8   and the ammunition, but there is one package that has

9   earrings in it.  There were earrings that were also purchased

10  right then and there.

11         But there is something said, and as I understand

12  it, it's said by Philip, and it goes along the line of,

13  Aren't you going to help her with the box?

14         Mr. Reilly picks the box up, carries the box from

15  there, puts it in the trunk of the car.

16         That is the firearm offense.  He's not charged with

17  the pistol.  He's not charged with any guns found in the

18  residence.  He's not charged with the marijuana.  He's

19  charged with that specific shotgun, carrying it from point A

20  to point B.  That's it.

21         I made the Court aware yesterday of the law in the

22  Eleventh Circuit dealing with innocent transitory

23  possession.  It is an open question.  There has never been a

24  factual situation that I have been able to uncover that is

25  even close to this.

1          In the case that I gave --

2          THE COURT:  Are you talking about the *Palma* case?

3          MR. SADOW:  Correct.  In *Palma*, it was clear he had

4   the gun, he was trying it out, trying the gun out, all of

5   those things, none of which are present here.  And I think

6   all of that is recognized.

7          I will show you what I have marked as Defense

8   Exhibit No. 1.  Defense Exhibit No. 1 is the Department of

9   Justice Bureau of Alcohol Tobacco Firearms & Explosives

10  National Tracing Center for the shotgun.

11         I move Defense Exhibit No. 1 into evidence.

12         MR. GHOSE:  No objection.

13         THE COURT:  It's admitted.

14         MR. SADOW:  It shows recovery information.  It

15  indicates the possessor, and it indicates the possessor is

16  Ms. Taylor, not the defendant.  Now, that is the shotgun.

17         Defense Exhibit No. 2 --

18         MR. GHOSE:  Where did that come from?

19         MR. SADOW:  It came from the wedding

20  announcement.

21         I would move the Court for Defense Exhibit No. 2,

22  which is simply the save-the-date for the wedding of May

23  17th, 2014, just as proof that there is in fact a wedding on

24  that date.

25         I would point out that at the day they were at the

1      pawn shop and Ms. Taylor made the purchase of the two

2      firearms, they were followed to the marriage license bureau

3      from there to get -- that is, so there is no question that

4      that is real.

5           I have as 3, 4, 5 and 6 four incident reports

6      reflecting criminal activity near the residence that they

7      were living at at the time, which is the Niskey Lake Road,

8      indicating that there were activities, none of which involve

9      the defendant or Ms. Taylor, but that there were criminal

10     activities and reasons for why a weapon -- a weapon was

11     necessary or more weapons were necessary at the residence.

12          I move 3, 4, 5 and 6 in just as proof of activity

13     going on prior to March 19th.

14          MR. GHOSE:  No objection.

15          MR. SADOW:  I also have tax returns, which I would

16     prefer not to put into evidence, but I have tax returns for

17     2012 and 2011 for the defendant's company, DBR JR Strategies,

18     Inc., reflecting a gross of $292,500 in 2012 and a gross of

19     $268,200 in 2011.  A 2013 return is not done yet.

20          What this really boils down to, Your Honor, is

21     absolute bottom line, and recognizing from past dealings with

22     the Court that this is really where we come out, this Court

23     could have every reason it wants to to deny bond.  There is

24     no question that based on the facts in this case, Your Honor

25     could determine that there are no conditions of release that

1    would reasonably assure.

2           And if this were a large-scale drug case, I would

3    understand it.  If this were even a drug case, I would

4    understand it.

5           But what we have is we have a transitory innocent

6    possession case which will certainly take a number of months

7    to resolve.  Based on the facts that are available here if I

8    am permitted to put forth a transitory innocent possession

9    case, there is a substantial likelihood that potentially the

10   Court or even a jury would find the defendant not guilty.

11          Is it -- under these circumstances, is it

12   appropriate, fair and reasonable to make the defendant reside

13   in jail during the pendency of this case?  The answer to that

14   is, in my opinion, no, when there are conditions that will

15   reasonably assure here that the defendant does not pose a

16   risk of flight or a risk of dangerousness that cannot be

17   overcome.

18          And again a $250,000 secured bond gives you a

19   bonding company that is not about to let him go absent.

20   Residing in a home 24-7 indicates that he will have the

21   stability, with the GPS as well.

22          And I just think that, while equity typically

23   doesn't enter into the situation, this doesn't appear to be

24   the typical firearm case.  In fact, I can't remember any case

25   brought in this district in which the entire charge was based

1    on carrying a shotgun from point A -- or any gun from point A

2    to point B.

3            And as I pointed out in my moving papers,

4    Ms. Taylor has not been charged.  Mr. Reilly has not been

5    charged even with the pistol.  So the idea of a straw

6    purchase I suggest is not their theory.  Their theory is they

7    were able to get him to carry it from point A to point B and

8    that's why he's sitting here.

9            Under those circumstances, I ask the Court to

10   consider and impose the conditions of bond I suggest.

11           THE COURT:  Thank you.

12           Mr. Ghose?

13           MR. GHOSE:  Your Honor, there are a number of

14   things that I want to respond to, but I would just at first

15   point out that, although the single count in the indictment

16   at this time, which was done, you know, within the time

17   period allowed after the arrest on a criminal complaint, is a

18   sole felon-in-possession count, there is evidence in the

19   magistrate record, there is evidence I am going to present

20   today which indicates that Mr. Reilly was a large-scale

21   marijuana distributor.

22           I have documents that indicate that within the last

23   30 months, there was over a million dollars going in between

24   different bank accounts, in and out of between eleven

25   different states.

1          There is evidence that there were 16 cameras on the

2    house where this arrest and search took place, and that there

3    was marijuana in there, large heat sealers for packaging

4    large quantities of marijuana.

5          And if you talk about the gun case itself, it is

6    in fact a strong case.  There are text messages between

7    Mr. Reilly and Ms. Taylor on March 8th, 2014, just days

8    before this arrest took place, where he says to Ms. Taylor:

9    I need you to go buy an assault rifle today, in a text

10   message to her.  And she says:  Okay, I will go.

11         And if you look at the video, as Mr. Sadow has --

12   and I have the video, Your Honor.  I'm ready to play it if

13   the Court would like to see it firsthand.

14         But essentially the part that Mr. Sadow is

15   describing is Ms. Taylor on the other side of the store

16   talking on a cell phone, and Mr. Reilly on the other far end

17   of the counter pointing out to the clerk which firearm to

18   buy, and he's talking with that guy about the shotgun, the

19   same shotgun that he carried out himself to the car and for

20   which he's been charged on the felon-in-possession count.

21         This is a straw purchase case.  Ms. Taylor will be

22   indicted on straw purchase.  There will be money laundering

23   charges.  There will be drug charges.  But at this time, this

24   is a single-count firearm case, but it involves risk of

25   flight and danger to the community that is significant.

1      I don't need to recap all the points about risk of

2  flight from the magistrate transcript hearing, but Your Honor

3  is aware that there were four fake IDs found on his

4  possession when he was arrested in multiple different names,

5  multiple states, different dates of birth, and they were all

6  current.

7      Two of the IDs that were found, one on him and one

8  in the house that was searched pursuant to a search warrant,

9  the Niskey Lake Road house, included foreign documents that

10  he could travel abroad with.  And in fact, he had traveled

11  from Dominican Republic only weeks before.  There were

12  Dominican pesos found in the house that he shared with

13  Ms. Taylor.

14      There were another -- there were two other firearms

15  found in the house with Ms. Taylor.  There were shell casings

16  outside their house.  This was a dangerous place because of

17  the defendant's drug and illegal activity.

18      So to say that there is no risk of flight in this

19  case and there is no danger to the community, this is a sole

20  gun case, that is not taking into account the whole picture

21  here.  And we are allowed to look into those facts at this

22  stage.

23      And I think it would be a real mistake to take the

24  risk of the likelihood that the defendant would either engage

25  in activity that is a danger to the community or he would

1    flee using substantial assets that he has, using the ability

2    he has to travel abroad, to create fake identifications, all

3    of that could be taken into account in the fact that this is

4    a significant case that warrants detention.

5           I mentioned that the company, the DBR Strategies,

6    which apparently there are tax records which I haven't

7    seen -- although I made a reciprocal discovery request, but

8    I haven't seen those documents -- there was nothing found in

9    the house where Mr. Reilly purportedly operates this base

10   where he makes three hundred thousand dollars plus a year

11   showing that he had any actual documentation of this business

12   other than from what I am aware of a W-2 made out to his

13   fiancee from his company for $125,000.

14          Now, there are bank accounts, and I have the

15   spreadsheet which I could tender to the Court in a minute,

16   that indicates that there are a number of bank accounts in

17   the name of DBR Strategies, which I assert is his shell

18   company that he launders money through, but there are no

19   transactions in those accounts from what I am told by my

20   agent where there is anything other than cash transactions.

21          So if what Mr. Reilly is saying is that he's

22   actually legitimately employed by a credit repair company,

23   it's apparently a credit repair company that only operates in

24   cash.

25          I think the Court is aware of what's actually going

on here.  Mr. Reilly is a large-scale marijuana distributor who deals with large quantities of cash.  He had $150,000 in the house that he shared with Ms. Taylor at the time that it was seized.  So this is not just a simple little gun case.

And I should point out that if -- even if it were, if it were to remain a single-count gun case, this is a strong case because Mr. Reilly asked Ms. Taylor to purchase the assault rifle beforehand, he's on video pointing out the firearm to purchase but notably steps away because he knows he's not permitted to touch it, which is very indicative of a straw purchase.

And when he walks out, he actually constructively possesses it.  He's seen by agents holding the blue shotgun box which the agents discovered a firearm in.  And when they are both consensually interviewed later that same day, Ms. Taylor says, Yes, he told me which one to pick out.

And on top of that, there is law in the circuit --

THE COURT:  When you say which one to pick up, you were talking about which one to carry?

MR. GHOSE:  Which one to -- I believe the exact phrase was -- let me just check with my agent.

So, yes, this is documented in the report, I think we addressed it in the magistrate hearing as well, but she said to the agents that he had paid for the firearms, although in the store she pulls nine thousand dollars of cash

1  out of her pocket, and that he was the one who picked it out,

2  told her what to pick out.  Now, I don't know if that --

3       THE COURT:  You don't know what that means, whether

4  he was saying this is what -- pick this up at the store or

5  whether literally they are both at the store, it's time to

6  leave, and he says, Okay, you carry this one.

7       MR. GHOSE:  Right.  Certainly I would --

8       THE COURT:  And I don't actually recall, did she

9  carry one of them out of the store?

10      MR. GHOSE:  She carried the FN pistol, which has

11  not been charged, and he carried the Mossberg shotgun.  And

12  that is the gun that he was pointing out to the clerk, and

13  he's the one who actually carried it out of the store.

14      And there is case law, the *Palma* case, I read it,

15  the Court can read it as well --

16      THE COURT:  I have read it.

17      MR. GHOSE:  The facts in that case are remarkably

18  similarly to this case, and the Eleventh Circuit said we have

19  never recognized the defense of transitory innocent

20  possession, we have never recognized that defense.

21      And we don't need to here today, because the facts

22  which are very similar to this case don't warrant that jury

23  instruction.

24      And there are cases, one case out of the Third

25  Circuit, *United States v. Ponds*, 499 Federal Appendix 204 at

1   page 206, and then another case, *United States v. Mercado*,

2   412 F 3d 243 at 251, that's a First Circuit case, where the

3   evidence that the defendant held the firearm for a few

4   seconds could properly support a 922 (g) conviction.

5         This is an actual construction case that he would

6   be convicted on.  I would be willing to take the chance at

7   trial on this case.

8         But in any case, this is simply a detention

9   hearing.  The grand jury has returned a probable cause

10  finding on this case, they have charged him.  And the factors

11  that were presented at the magistrate level and can be

12  presented today, if Your Honor will allow me to present some

13  new exhibits to the Court, further establish the risk of

14  flight, the danger to the community, the fact that the

15  defendant is a poor candidate for supervision, and the

16  likelihood of the conviction.

17        Now, there are a few points that I just wanted to

18  raise as well.

19        The house that Mr. Sadow suggested Mr. Reilly

20  should be living in, that's the first time I have ever heard

21  of that address.  And that is saying something, because there

22  are at least five or six different addresses that Mr. Reilly

23  has given to law enforcement over the course of the last

24  several months in Atlanta, and they are documented in the

25  magistrate transcript.

1        He gave an address to the marshals, he gave an

2    address to ATF, he gave -- he had multiple fake

3    identifications, none of them I have ever seen -- there are

4    police reports from his DUI arrest in March of 2014 and the

5    the instant arrest as well, and I have never once seen that

6    address.

7        And in fact, Mr. Taylor's mother last I knew a few

8    weeks ago lived at a Hassana Lane address.  So I don't even

9    know where this house is or whether that would be a

10   sufficient location for home detention.

11       But in any case, home detention doesn't prevent

12   Mr. Reilly from operating his marijuana business, from

13   operating his money laundering business, from communicating

14   by phone or on a laptop, none of that could be prevented.

15   And in fact, home detention doesn't prevent him from walking

16   out the door and flying to the Dominican Republic.

17       The passport that was seized by ATF was a duplicate

18   passport.  There is no way to know whether there is another

19   passport that's floating around out there which he could use

20   to travel abroad.

21       And given the fact there are over a million dollars

22   of transactions over the past 30 months from his bank

23   accounts, it's not a stretch to believe that he could in fact

24   leave the country and not stand -- not stand trial in this

25   case.

1           Your Honor, I do have now, if I could, I have a

2    little bit of evidence that I could either just tender to the

3    Court as exhibits or I could put my agent on the stand.  It's

4    kind of the Court's inclination I would follow in this

5    situation.

6           I have a Government's Exhibit No. 8, which

7    I provided to defense counsel.  I also have Exhibits 9 and

8    10.  I have numbered them this way because the exhibits from

9    the magistrate transcript are 1 through 7, so I'm just kind

10   of using them consecutively.

11          But Exhibit No. 8 are excerpts from the cell

12   phone -- one of the three cell phones taken from Mr. Reilly

13   from his pocket at the time of the arrest of this offense.

14          Mr. Reilly consented to have those phones searched.

15          THE COURT:  Let me just stop you for a second.

16          Normally I would let the appealing party go

17   first.  I don't know if it makes any difference to you all.

18          Mr. Sadow, do you care whether these are tendered

19   now or do you want to go first?

20          MR. SADOW:  Well, Your Honor, I will have

21   objections to 9 and 10.  I have no objection to 8.  And

22   therefore timing-wise, I don't think it makes a difference

23   whether 8 goes in now or later.  But I will, like I said, on

24   9 and 10 --

25          THE COURT:  I will go ahead and admit 8.

1           Do you prefer to present your stuff before I rule

2     on their exhibits?

3           MR. SADOW:  Well, what he does on 9 and 10, my

4     objection is going to be I have no records that underlie

5     these summaries.  The prosecutor doesn't have any records

6     that underlie these summaries.  These are summaries made by

7     an agent.

8           They don't have any specific dates.  I can't show

9     whether monies from one account went into another account, I

10    can't determine any of that from these.  And it's a

11    three-year summary.

12          So it purports to show what they want it to show,

13    but why it shows that, there is no way for any of us to know

14    without the records.  So that would be my objection.

15          I understand the Court can still consider it, but

16    that's the basis for it.

17          THE COURT:  Okay.  Let me hear what you have to

18    say, Mr. Ghose, about the admissibility of Exhibits 9 and

19    10.

20          MR. GHOSE:  Well, number one, I would say that this

21    is a report from an agent.  I think that hearsay evidence is

22    admissible.

23          I have the agent here today and I'm happy to put

24    that person on the stand.

25          THE COURT:  Do you have the underlying documents

1    that went into creating the exhibit?

2         MR. GHOSE:  I got the summary late in the day

3    yesterday from one of the agents here.  She does have those

4    documents.  We are talking boxes and boxes of material.

5         So I specifically asked for the records.  She said

6    there are boxes.  And I said, well, let's just use the

7    summary instead.

8         And I feel that at this stage that it would be

9    appropriate, particularly if I have the agent available to

10   testify about what she has reviewed.

11        THE COURT:  Well, the rule does require that the

12   summaries be made available, and what do you have to say

13   about that?

14        MR. GHOSE:  The summary being made available?

15        THE COURT:  To the other side.

16        MR. GHOSE:  Well, I did provide -- I got this

17   yesterday and I provided it to defense counsel beforehand.

18        THE COURT:  But not the underlying documents --

19        MR. GHOSE:  Correct.

20        THE COURT:  -- that it was drawn from?

21        MR. GHOSE:  It just wasn't practical, Your Honor,

22   in time.

23        THE COURT:  Yeah, I understand.  Unless there is

24   some exception that would apply for a hearing of this type --

25   and I don't think there is -- then the objection would be

1    well taken.

2              MR. GHOSE:  I understand, Your Honor, and I'm happy

3    to just rely on what I have proffered to the Court about his

4    financial history and his financial records.

5              THE COURT:  Okay.  So I will sustain the objection

6    to Government's Exhibits 9 and 10 at this time.

7              MR. GHOSE:  Your Honor, would I be permitted to

8    call the agent to testify, not with the document that she's

9    prepared, but just to her own personal knowledge as to the

10   investigation that she's covered?

11             THE COURT:  Sure, you can call whoever you like.

12             MR. GHOSE:  I think what I would like to do, if the

13   Court would like me to put my witnesses on first, I have

14   my -- one of my agents who could testify as to the cell phone

15   records in this case --

16             THE COURT:  Well --

17             MR. GHOSE:  -- and I have the other agent for the

18   financial --

19             THE COURT:  Again, I don't know if it makes any

20   difference to you all who goes first, but Mr. Reilly is the

21   appellant and he's taking the appeal.

22             MR. SADOW:  I don't have any problems with the

23   government presenting its evidence first.

24             THE COURT:  Okay.

25             MR. GHOSE:  Then in that case, if I can just

1    consult for one minute, Your Honor?

2           Okay.  Your Honor, I will go ahead and call the

3    first of my two witnesses then, Christa Morgan with the ATF.

4           THE COURT:  All right.

5           THE CLERK:  Step forward, Ms. Morgan.

6           (The oath is given by the Courtroom Deputy Clerk.)

7           THE CLERK:  Be seated, and state your full name for

8    the record?

9           THE WITNESS:  Christa K. Morgan.

10                        --   --   --

11                      CHRISTA K. MORGAN

12       being first duly sworn by the Courtroom Deputy Clerk,

13                   testifies and says as follows:

14                        --   --   --

15                      DIRECT EXAMINATION

16   BY MR. GHOSE:

17   Q.   Thank you, Ms. Morgan.  Could you tell the Court how you

18   are employed?

19   A.   I'm employed as a forensic auditor with Bureau of

20   Alcohol Tobacco Firearms & Explosives here in Atlanta.

21   Q.   How long have you been so employed?

22   A.   About five years.

23   Q.   And do you investigate -- what kind of crimes do you

24   investigate?

25   A.   Anything under the ATF's jurisdiction that involves a

1    financial type of crime.

2    Q.    So are you a financial forensic analyst?

3    A.    Yes.

4    Q.    Okay.  And so what kinds of duties and tasks do you do

5    as a forensic financial analyst?

6    A.    One of the things I do is analyze bank records, business

7    records, tax returns, any type of financial documents that

8    would be involved in an investigation.

9    Q.    Okay.  And have you been working on this case involving

10   the defendant, Deshawn Reilly?

11   A.    Yes.

12   Q.    What records have you been reviewing, if any, regarding

13   Mr. Reilly and his businesses?

14   A.    I have been reviewing multiple bank account records to

15   include the statements and the supporting documents for those

16   statements.  We have obtained some records from the search

17   warrant that took place in March of this year.  I have

18   reviewed -- those are the primary documents I reviewed for

19   this case.

20   Q.    What is the scope of time that you have been reviewing

21   these documents for?

22   A.    Primarily the beginning of 2011 through the end of

23   2013.  We have also looked at some documents after 2013.

24   Q.    And have you personally reviewed all the different bank

25   account records that pertain to Mr. Reilly?

```
 1   A.   All of the bank accounts that I am aware of, yes.
 2   Q.   How many bank accounts are we talking about?
 3   A.   Right now, I have nine bank accounts that are in the
 4   name of either DBR Strategies, Inc., or Mr. Reilly himself.
 5   Q.   And based on your investigation, what is DBR Strategies,
 6   Inc.?
 7   A.   I'm not sure what DBR Strategies, Inc., is.  Based on
 8   information in the bank accounts, I can't tell what type of
 9   business that would be.
10   Q.   Is it linked to Mr. Reilly?
11   A.   Yes.
12   Q.   How do you know that?
13   A.   His name is on the signature cards for the bank
14   accounts.
15   Q.   And what kinds -- have you reviewed the different
16   transactions that have been taking place in these accounts
17   that are linked to either Mr. Reilly or DBR Strategies?
18   A.   Yes, I have.
19   Q.   Please describe for the Court what types of transactions
20   you have seen in the records you have reviewed?
21   A.   The deposits into the accounts are primarily cash
22   deposits.  For the three-year -- approximately three-year
23   period of time that I have looked at so far --
24             MR. SADOW:  Your Honor, until this point it wasn't
25   objectionable.  Now, without the records, there is no basis
```

1    on which for her to give those calculations.

2            MR. GHOSE:  Your Honor, she's personally reviewed

3    this.  This is her personal knowledge regarding records she

4    reviewed.  This is permissible at this stage of the

5    proceeding.

6            THE COURT:  Do you have any documents in the

7    courtroom at this time?

8            THE WITNESS:  No, Your Honor.  They are at my --

9            THE COURT:  Where are all the documents?

10           THE WITNESS:  They are at my office.

11           THE COURT:  Where is your office?

12           THE WITNESS:  In Atlanta.

13           THE COURT:  I know that.

14           THE WITNESS:  2600 Century Parkway.

15           THE COURT:  Yeah, that's what I was thinking.

16           THE WITNESS:  Uh-huh.

17           THE COURT:  You know, I suspect some of the

18   witness's testimony might be admissible without the

19   documents, but Rule 1006 pertaining to document summaries to

20   prove content does seem to apply, although -- well, let's

21   see.  Let's read it.

22               The proponent may use a summary, chart or

23           calculation to prove the content of voluminous

24           records, recordings or photographs that cannot be

25           conveniently examined in court.  The proponent must

1          make originals or duplicates available for

2          examination or copying, or both, by other parties

3          at a reasonable time and place, and the Court may

4          order the proponent to produce them in court.

5          MR. GHOSE:  Your Honor, the witness is testifying

6    based on her memory, not on any documents.  I do have a

7    summary which I attempted to get into evidence, but she's not

8    using that document.  She just using what she --

9          THE COURT:  No, you are right, she's not using the

10   documents, but she is drawing her testimony from documents

11   that she has examined which are not available to the

12   defense.

13         MR. GHOSE:  But -- well, Your Honor, you know, we

14   have been proffering based on the video which hasn't been

15   introduced in court.  I understand --

16         THE COURT:  Yeah, but we all know what's on the

17   video.

18         MR. GHOSE:  Right.  I mean, obviously, Your Honor,

19   it's no different than someone testifying as to, you know, a

20   firearm search or something like that based on their personal

21   knowledge.

22         THE COURT:  Well, it might just depend on how

23   voluminous these documents are.  I don't know to what extent

24   I could be sure that the defendant has knowledge of the

25   documents that the witness is talking about.

```
 1            I think maybe the best way to proceed is this.  Go
 2    ahead and put on the evidence you want to put on, and if the
 3    defense wants for me to bifurcate the hearing and give them a
 4    chance to look at the documents, then we could come back and
 5    Mr. Sadow can have a thorough and sifting
 6    cross-examination.
 7            Okay.  Go ahead.
 8            MR. GHOSE:  That sounds fine.
 9            THE COURT:  Overruled.
10            MR. GHOSE:  So I think the question --
11            THE COURT:  And let me say this.  I may wind up
12    striking the witness's testimony.  We will have to think
13    about it later.
14            MR. GHOSE:  Okay.  I understand, Your Honor.
15    BY MR. GHOSE:
16    Q.  I think the question I left off on was regarding your
17    review of the bank records for Mr. Reilly and his business,
18    DBR Strategies.
19        And I think the question that I left on was the nature
20    of the transactions that you observed in reviewing these bank
21    records.  Could you please explain to the Court what the
22    nature of those transactions were?
23    A.  Yes.  In terms of the deposits to these nine different
24    accounts, the total of all nine accounts combined was
25    approximately 1.6 million dollars.
```

1        Of that, over 1.1 million dollars was cash deposits,

2   cash in, currency in.  About four hundred and some odd

3   thousand dollars were transfers from other accounts.  And

4   then there were some other miscellaneous deposits.

5        For the withdrawals from these same accounts, there are

6   about the same amount of withdrawals as deposits, about 1.6

7   million; about the same amount of transfers out, four hundred

8   and some thousand; about nine hundred thousand dollars of

9   cash coming out of the accounts, again, currency.

10       And then the rest -- and I don't do math in my head, so

11  I don't -- can't give you the exact figure, but the balance

12  of withdrawals coming out would be things for like travel

13  expenses, personal living expenses, gas, restaurants, some

14  high-end shopping and those kinds of things.

15       I did not see anything that I recognized as a business

16  expense, the normal, like, any kind of rent of business

17  premises or payments to any employees or anything like that.

18            MR. GHOSE:  Your Honor, that's actually all

19  I wanted to get into evidence.  I have no further questions

20  for this witness.

21            THE COURT:  Okay.

22            MR. SADOW:  For purposes of my examination, do you

23  have Government's Exhibits 9 and 10 in front of you?

24            THE WITNESS:  I do not.

25            MR. SADOW:  Do you mind producing her a copy?

1          MR. GHOSE:  Don't you have a copy?

2          MR. SADOW:  I have a copy, but I need for her to

3    have a copy to ask her about.

4          THE COURT:  Now, they are not in evidence.

5          MR. SADOW:  No, I understand.

6          MR. GHOSE:  Can I use your copy?

7          MR. SADOW:  You really can't use my copy.  Where is

8    the original of 9?

9          MR. GHOSE:  That's 8.  One is withdrawal and one is

10   deposits.

11         MR. SADOW:  I know.

12         MR. GHOSE:  Okay, here it is.  There you go.

13         MR. SADOW:  May I approach, Your Honor?

14         THE COURT:  Yes.

15                    --  --  --

16                  CROSS-EXAMINATION

17   BY MR. SADOW:

18   Q.   I'm just going to hand you 9 and 10.  They are not in

19   evidence, but I'm going to ask you certain questions and you

20   may be able to reference them from those documents.

21         I think you gave us an estimate that the cash

22   withdrawals was approximately nine hundred and fifteen

23   thousand dollars; correct?

24   A.   Yes.

25   Q.   Those withdrawals were from the total number of accounts

1    that -- those nine accounts?

2    A.   Yes.

3    Q.   Where did that cash go?

4    A.   I don't know where it went.

5    Q.   Well, was any of it a withdrawal or any of that go into

6    cash deposits?

7    A.   I don't know that.

8    Q.   What I'm saying is if you have fifty thousand dollars

9    withdrawn on day A, how do you know that fifty thousand or

10   some part of fifty thousand didn't go back in on day C?

11   A.   I suppose that could happen.  I don't know why that

12   would happen, but --

13   Q.   I didn't ask you why it could happen.  I just asked you

14   how do you know it didn't happen.

15   A.   I know some of the transactions I looked at will show

16   cash going into the account and then being withdrawn in a

17   different location in the same day.

18   Q.   Okay.

19   A.   So I can tell you that that would be some of it.

20   Q.   What I'm trying to do is how have you been able to

21   eliminate that there are multiple deposits with the same cash

22   over a period of these three years that you say?

23   A.   Well, at this point in time, I have not done that.

24   However, this is a preliminary examination of the accounts.

25   Q.   And I understand that.  I'm just trying to understand

```
 1    when you came up with totals, these are totals in which you

 2    have not worked through on a chronology day-by-day of money,

 3    accounts; correct?

 4    A.   Not at this point.

 5    Q.   In fact, when you have a cash withdrawal of let's say

 6    for one account of the DBR Strategies for 202 -- that is,

 7    Account No. 202 -- you have a withdrawal amount let's just

 8    say of $66,000, that is --

 9    A.   The total for that account for this period of time.

10    Q.   -- over three years?

11    A.   Yes.

12    Q.   How much of that could have been on one day?

13    A.   That would be shown in the records that underlie these

14    figures.

15    Q.   But you don't know that information?

16    A.   I don't know it off the top of my head.  I have the

17    information.

18    Q.   I mean, what I'm saying is let's say in 2011, just as an

19    example, there was a withdrawal of $55,000 from that account

20    on one day.  That would mean that there was $11,000 withdrawn

21    from that account over the next two years; right?

22    A.   I can tell you from reviewing the accounts that there

23    weren't any withdrawals in that large of an amount.

24    Q.   What were the largest withdrawals?

25    A.   As I recall, it would be something just under ten
```

1   thousand dollars.  Maybe nine thousand, ninety-five hundred,

2   that range.

3   Q.   There were no withdrawals that were more than ten

4   thousand dollars?

5   A.   I'm not saying there weren't.  I don't recall any, but

6   I don't have the whole analysis in front of me either.

7   Q.   Are you able to at least give us a time frame as to

8   whether there was more in 2011, 2012 or 2013 either as to

9   deposits or withdrawals?

10  A.   Not from this, no, I'm not able to tell you at this

11  point.  Again, this is a summary of what happened in the

12  accounts that I reviewed for approximately 30 months.  I can

13  give you that information at some point.  I can't give it to

14  you today.

15  Q.   Okay.  And are you able to -- for example, are you able

16  to eliminate that cash that was withdrawn from a corporate

17  account may have gone into a personal account of Mr. Reilly?

18  A.   There were some transfers, as you can see on the

19  spreadsheet.  There were transfers from accounts to other

20  accounts.

21  Q.   No, but I'm --

22  A.   That's sort of eliminated in the analysis.

23  Q.   No, I'm specifically saying cash withdrawals that may

24  have gone into cash deposits from the corporate to an

25  individual account?

1    A.   I have not yet done that analysis, so -- again, this is

2    preliminary.   This is a summary.

3    Q.   So the summary at this point is essentially you have

4    just added up everything and have not attempted to actually

5    trace the money itself?

6    A.   I have done some of that, but that was not the purpose

7    of today's testimony.

8    Q.   What was the purpose of today's testimony?

9         MR. GHOSE:   Objection, Your Honor.  I don't know if

10   that's an allowable question.

11        THE COURT:   Sustained.

12        MR. SADOW:   That's all, Your Honor.

13        THE COURT:   Anything else?

14        MR. GHOSE:   I have one follow-up question.

15                         -- -- --

16                   REDIRECT EXAMINATION

17   BY MR. GHOSE:

18   Q.   What is the significance of the transactions being in

19   the nine thousand dollar range?

20   A.   There is a reporting requirement that the banks have to

21   follow that if there is a cash transaction, either funds

22   going into the account or out of the account, that exceeds

23   ten thousand dollars in either one transaction or related

24   transactions, there is a reporting requirement for that.  And

25   if the transaction is not over that dollar amount, then the

1    form doesn't have to be filed.

2    Q.   And did you see a number of these kinds of transactions

3    in Mr. Reilly's accounts?

4    A.   I did.

5             MR. GHOSE:  Nothing else, Your Honor.

6             MR. SADOW:  May I ask one question, one more

7    question that's outside the scope of that direct?

8             THE COURT:  Okay, go ahead.

9             MR. GHOSE:  Your Honor, I would object actually to

10   that.  I don't know why -- why can he open it up like that?

11            THE COURT:  I will allow it.

12                        --  -- --

13                   FURTHER CROSS-EXAMINATION

14   BY MR. SADOW:

15   Q.   I understand that you in fact are an ATF agent; correct?

16   A.   A forensic auditor.

17   Q.   I am going to show you what has been introduced as

18   Defense Exhibit No. 1.  Are you familiar with those forms?

19            MR. GHOSE:  Objection, Your Honor.  I don't think

20   this witness has any knowledge of ATF firearms trace forms.

21   A.   This is not my area of expertise.

22   Q.   So you do not know what Defense Exhibit No. 1 is?

23            MR. GHOSE:  Objection, Your Honor.

24            THE COURT:  Overruled.

25   A.   I know that it's a firearms trace, but I don't deal with

1   this in my line of work.  I do the financial analysis.

2   Q.    I will do it a different way.  Have you ever had a

3   case -- how long have you been with ATF?

4   A.    Five years.

5   Q.    Have you ever had a case when you filled out such a form

6   as Defense Exhibit 1?

7   A.    No.

8   Q.    Have you ever had any training in filling out a form

9   such as Defense Exhibit No. 1?

10  A.    No.

11  Q.    So you do not know any of the factors or criteria that

12  would go into play -- or come into play in determining what

13  information should be put on Defense Exhibit No. 1; is that

14  correct?

15  A.    That is correct.

16          MR. SADOW:  Then I have -- based on that,

17  Your Honor, there is no foundation for asking about that

18  particular form.

19          THE WITNESS:  That's not the form we were referring

20  to if you are talking about the threshold, the financial

21  threshold.

22          MR. SADOW:  No, no, no.  I was asking you

23  specifically about this form, and based on your testimony it

24  doesn't appear that you have any familiarity with it at

25  all.

1          So that's all I have.

2          THE COURT:  You can step down.

3          What's next?

4          MR. GHOSE:  My next witness, Your Honor, is

5    Special Agent Chuck Sedberry.

6          (The oath is given by the Courtroom Deputy Clerk.)

7          THE CLERK:  Be seated, and state your full name for

8    the record and spell your last name, please?

9          THE WITNESS:  Charles Sedberry, S-e-d-b-e-r-r-y.

10          THE CLERK:  Thank you.

11                        --   --   --

12                      CHARLES SEDBERRY

13      being first duly sworn by the Courtroom Deputy Clerk,

14                 testifies and says as follows:

15                        --   --   --

16                      DIRECT EXAMINATION

17    BY MR. GHOSE:

18    Q.   Are you the case agent, Agent Sedberry, in this case?

19    A.   Yes, I am.

20    Q.   And did you testify at the preliminary hearing and

21    detention hearing in this case?

22    A.   Yes, I did.

23    Q.   Were you involved in the surveillance of Mr. Reilly on

24    the day that he was arrested on these federal charges?

25    A.   Yes, I was.

1    Q.   And were you involved in the subsequent questioning of

2    Mr. Reilly?

3    A.   I was there for a portion of the questioning.

4    Q.   And were you present for his arrest?

5    A.   Yes, I was.

6    Q.   Was Mr. -- did you witness the arrest or did you conduct

7    the arrest yourself?

8    A.   I witnessed the arrest.

9    Q.   Did other agents conduct it?

10   A.   Yes, they did.

11   Q.   When the agents of ATF arrested Mr. Reilly, were any

12   possessions taken off his person incident to arrest?

13   A.   Yes, there were.

14   Q.   What were some of those items?

15   A.   His wallet with his IDs and three cell phones.

16   Q.   Did Mr. Reilly -- did you ask Mr. Reilly if you could

17   search those cell phones?

18   A.   Yes.  Not personally, but, yes, an agent did.

19   Q.   And were you present for that consent request?

20   A.   No, I was not.

21   Q.   Okay.  You were just told that Mr. Reilly consented to

22   have his cell phone searched?

23   A.   Yes, I was.

24   Q.   All right.  And this is on the day of his arrest on

25   March 19th?

1    A.    Yes.

2    Q.    When did ATF conduct the actual search of the cell

3    phone?

4    A.    It was done on location, the day of the arrest.

5    Q.    Was it done using -- kind of manually or did you use a

6    piece of equipment for it?

7    A.    No, a Cell Bright device was used to analyze his phones.

8    Q.    What is Cell Bright?

9    A.    It is basically a computer -- it's my understanding it's

10   a computer software device that is used to extract

11   information on cell phones and put it into a report format.

12   Q.    Who operated the Cell Bright machine?

13   A.    Special Agent Kosch.

14   Q.    And did you communicate with Special Agent Kosch about

15   the fact that he had extracted data from the cell phones of

16   Mr. Reilly?

17   A.    Yes, I did.

18   Q.    Did you review the report that was produced for one of

19   the three cell phones, a white iPhone 5?

20   A.    Yes, I have.

21   Q.    And did you review the report that was produced for this

22   particular cell phone?  I just asked that.

23   A.    Yes, I did.

24          MR. GHOSE:  Your Honor, this is Exhibit No. 8 which

25   relates to this.  I provided a copy to defense counsel and I

1    have a copy for the witness as well.

2    BY MR. GHOSE:

3    Q.   Agent Sedberry, could you review that document and tell

4    the Court what that is, if you know?

5    A.   This is the phone examination review that I have gone

6    over pertaining to Mr. Reilly's cell phone.

7    Q.   Now, is this the full report or are these just excerpts?

8    A.   This appears to be just an excerpt, a portion.

9         MR. GHOSE:   Your Honor, I would like to move this

10   into evidence.

11        MR. SADOW:   I thought it was already entered.

12        THE CLERK:   I thought it was already entered.

13        MR. GHOSE:   Okay.

14        THE COURT:   State the exhibit number again?

15        MR. GHOSE:   Government's Exhibit No. 8.

16        THE CLERK:   Unless you have two 8s?

17        MR. GHOSE:   No, that's correct.   I'm mistaken, it

18   was already admitted into evidence.

19   BY MR. GHOSE:

20   Q.   Now, on this cover page, page one of this multi-page

21   exhibit, No. 8, there is an extraction start and date time.

22   What is the start and date time?

23   A.   March 19th, 2014, at it says 13:04:34, so it would be

24   one o'clock, 1:04 p.m.

25   Q.   And the category below that says phone examination

```
1    report index, there are four categories of material that are

2    selected as being material that was extracted from this

3    report.  What are those categories?

4    A.   One would be contacts, the other one is SMS text

5    messages, call logs, was skipped to or failure, and then

6    instant messages, and also images.

7    Q.   So let's take a look at each of these categories.  Just

8    looking at the second page here, this is the phone contacts

9    part; is that correct?

10   A.   Yes.

11   Q.   But there is only two contacts here?

12   A.   Correct.

13   Q.   Flipping to the third page, this is the SMS text message

14   section.  Is that correct?

15   A.   Yes.

16   Q.   Now, can you explain to the Court what phone number this

17   phone relates to?

18   A.   Yes.  Now, the text messages will not demonstrate the

19   phone number.  It just shows that the number that is sending

20   the text to the receiving phone.

21       It's actually easier to tell the exact phone by looking

22   at the instant message.

23   Q.   What is the difference between the instant message and

24   the text message?

25   A.   It's my understanding that the instant message is just a
```

1    newer format of messages, and it's supposed to mirror a

2    conversation as opposed to the delay that you may have in a

3    text message.

4    Q.    Now, if you -- actually, if you flip to -- could you,

5    just to point out an example to the Court, could you flip to

6    the I message or instant message section of this report?

7         Can you give me an example based on the page number at

8    the top right-hand corner of how we know what the phone

9    number is that's producing or receiving these text messages

10   or instant messages?

11   A.    Sure.  If you look at it may be the first page of the

12   instant messages on page 94, under number two it will say --

13   it actually demonstrates or lists the number of the phone,

14   which phone sent it out.  So it says from, and it's listed

15   area code 1-404-394-1828, which is the number that Mr. Reilly

16   said belonged to his phone.

17   Q.    And can you explain a little bit more how you know that

18   that 404-394-1828 number is Mr. Reilly's phone number?

19   A.    When he provided the phone to agents, he said that that

20   phone was in conjunction with this -- that phone number was

21   in conjunction with this phone.

22        But also in reviewing the content of the text messages,

23   he identifies himself on several occasions that this is

24   Deshawn, this is D, and so on and so forth.

25        Also other people will send him messages and say

1    Deshawn, this is so-and-so.  So he's identified himself and

2    by others on this phone.

3    Q.   So going back to the text message sections, the first

4    page of the text message section, there is actually three

5    examples of what you are referring to where he is identifying

6    himself as either D or Deshawn or Reilly.  That would be

7    Text Messages Nos. 1, 3 and 4; is that correct?

8    A.   Yes, that's correct.

9    Q.   All right.  And if you flip to the following page, in

10   the far left column where the text messages are identified by

11   number, Text Message No. 12 is another example of -- and

12   Text Message No. 18 are other examples of the writer of the

13   text message identifying himself as Deshawn Reilly or D?

14   A.   Yes, that is correct.

15   Q.   Now, at Text 15, there is also another example, but what

16   is that name there on Text Message 15 in the outgoing text?

17   A.   Okay.  In the outgoing text it says Leo Hurtault, SSN,

18   provides a number, date of birth, provides a number, and then

19   what appears to be an address.

20        Well, Leo Hurtault is the name or the fraudulent name ID

21   that Mr. Reilly had on him at his arrest as a driver's

22   license.

23   Q.   Now, the text message that followed that text, No. 15,

24   there is a sequence of texts which appear to be part of the

25   same conversation.  What is the -- just reviewing these text

1    messages, the content, what is the subject that's being

2    discussed by these text messages?

3         And I would point your direct attention -- I'm sorry,

4    there is actually a break in the -- if you go from the last

5    text on this page, which is page 22, the next one that -- it

6    goes to 565.

7    A.    Yes.

8    Q.    So it appears that that's where the excerpt is, so we

9    are actually skipping a bunch of texts and going to a later

10   one; is that correct?

11   A.    Yes, that's correct.

12   Q.    So if you look at Text Nos. 566 and 567, can you just

13   summarize for the Court what is being discussed there?

14   A.    It appears that they are talking about purchasing

15   precious metals, gold, platinum, silver, talking about the

16   prices, maybe U.S. coins, and talking about buying it, and

17   then the very end, for insurance for my little stash.  So

18   apparently what I believe is that --

19            MR. SADOW:  I'm going to object to apparently and

20   what he believes.  There is no qualification that he's able

21   to do that.

22            MR. GHOSE:  Why don't you just read --

23            THE COURT:  Sustained.

24            MR. GHOSE:  Yeah, I withdraw that.

25   BY MR. GHOSE:

```
 1   Q.   Why don't you just read the actual content of that
 2   incoming message at 566 and the outgoing message at 567?
 3   A.   Okay.  Text Message 566:  This is a basic breakdown of
 4   buying from a mint.
 5        And then 567:  Oh, okay.  I need some insurance for my
 6   little stash.
 7   Q.   And you had mentioned that it appears he was trying to
 8   buy some precious metal or something.  Based on your
 9   investigation, have you learned anything about whether or not
10   Mr. Reilly had made recent purchases of precious metals?
11   A.   During the interview, Mr. Reilly stated to agents that
12   he had purchased some gold in New York City, and then I
13   believe some other purchases have been identified under a
14   fraudulent name.
15   Q.   What was the dollar amount of the gold that was
16   purchased?
17   A.   I believe in the ballpark of forty thousand dollars.
18   Q.   And when was that purchase in relation to the federal
19   arrest on March 19th?
20   A.   Approximately a week prior.
21   Q.   So if you flip to the following sequence of text
22   messages, 575, 576, 577 and 578, can you just read the actual
23   content of the text messages for those four texts?
24   A.   Sure.  Starting at 575?
25   Q.   Yes, please.
```

1  A.    Okay.

2  Q.    And first, just tell us what the date is of that first

3  text?

4  A.    This will be March 17th, 2014.  It's an outgoing text

5  that says:  I am not there.  That is why I need insurance.

6        Then an incoming text received on the same day:  Oh,

7  yes, definitely.  Why not store them in a safety deposit

8  box?

9        Then an outgoing text, same day:  No, because they could

10  take it.

11       And then the next text incoming:  What if you had it in

12  some else name so in case you assets were frozen -- ever

13  frozen or liquidate, they can't touch it?

14  Q.    Okay.  And then advancing to the following page,

15  Text Nos. 590 and 591, can you read the content of the

16  incoming and outgoing messages of those texts, which also

17  appear on the same date, 3-17-2014?

18  A.    Okay.  590, an incoming text:  Hell, I need to get into

19  your business field so I can get a retirement cushion.

20       The next outgoing text:  It is in the gray area.

21       And the next text?

22  Q.    No, that's fine.

23       Now, let's take a look briefly at a couple of the -- and

24  I won't belabor this too much for the Court -- but a couple

25  of the instant messages as well, which is that second

1    category of text-like communications.

2         On Text -- or, rather, Instant Message No. 15, it says

3    this is a February 21st, 2014, instant message.  What is

4    the -- is that a text that is sent from the 1828 number?

5    A.   Yes, it is.

6    Q.   Rather, an instant message.

7         And in here, the speaker or the writer of the text is

8    identifying himself as D; is that right?

9    A.   Correct.

10   Q.   If you look at No. 17, the instant messages there, I

11   don't think we need to read it into the record, but what is

12   the discussion there between the 1828 number and the

13   706-346-3817 number?

14   A.   Well, there is an address, 2000 Enon Road, Atlanta,

15   Georgia, with a zip, and then the number 1.75 -- one million

16   seven hundred fifty thousand.

17        Then shortly after that, another outgoing -- I mean,

18   incoming, sorry, 245 Arledge Lane S.W., Atlanta, Georgia

19   30331, and then one million one hundred thousand.  Check this

20   out.  Just came on the market.  Very nice.

21   Q.   And do you know whose number that is, the 706-346-3817

22   number that is the sender of these I messages to the 1828

23   number that belongs to Mr. Reilly?

24   A.   Yes.  It's Ms. Taylor's number.

25   Q.   And how do you know that?

1   A.   It was taken -- it was on her phone taken from her own

2   person and she identified it as her phone.

3   Q.   And that's at the same time that the cell phones were

4   taken from Mr. Reilly?

5   A.   That is correct.

6   Q.   Just a couple more.  There is one particular sequence

7   I want to point your attention to, and that is on it says

8   page 36 of 94.

9        And this is structured a little differently because the

10  I messages are just sort of categorized by conversation like

11  you mentioned, so this is actually an I Message Conversation

12  No. 112 which starts on page 34 of 94 under the I message

13  category, but the particular text that I want to the alert

14  you to -- one minute, Your Honor.

15       Actually, Special Agent, maybe you could help me out

16  here.  For some reason I can't find when I was proffering the

17  information to the Court earlier about the -- oh, sorry,

18  I found it.

19            MR. SADOW:  It's page 30.

20  BY MR. GHOSE:

21  Q.   Yeah, so it starts with, yeah, page 34, like I said,

22  I Message 112, and then if you flip ahead to the same

23  conversation which is taking place on March 14th -- March

24  8th, 2014, page 38 of 94, the third and fourth messages which

25  are outgoing to Ms. Taylor, can you read into the record the

1    content of those messages and explain who the sender and

2    recipient is and what the time and date is of those

3    messages?

4    A.   Okay.  The third message on page 38 was on March 8th,

5    2014, at 17:27, and it's actually going from Mr. Taylor's

6    phone to -- correction, Mr. Reilly's phone to Ms. Taylor's

7    phone.  The text message states:  Should knows the whole

8    breakdown.

9        And then same thing, Mr. Reilly sends another text to

10   Ms. Taylor:  I need you to go buy a assault rifle today.

11       And then the next text message coming in from

12   Mr. Taylor's phone to Mr. Reilly's phone says:  Okay, I will.

13   Q.   All right.  And the last thing I want to point out is on

14   actually the very last page of this multi-page exhibit, this

15   document.  This is actually under the -- I think it's either

16   the photos or the attachments category, and there are

17   three -- the final three photos that are contained in this

18   section of the exhibit, can you explain to the Court what

19   these -- just describe for the record what these pictures are

20   of and the date and time that they are apparently taken

21   according to the time stamping?

22   A.   There are three photos, and they all appear to be of the

23   same item, which is an FN gun box that is consistent with the

24   box that the FN 57 pistol was in when Ms. Taylor purchased

25   it.

```
 1          The date and time -- the date is actually March 19th,
 2     2014, and the time stamp is 14:29.  However, it's Greenwich
 3     Mean Time, so you would have to subtract four hours, so that
 4     would put it Atlanta time 10:00, 10:30.
 5     Q.   Based on what you have seen in the video of the gun
 6     transaction in this case, is there any indication that
 7     Mr. Reilly was taking photographs of the FN pistol that was
 8     purchased at that time?
 9     A.   The video shows the box on the counter and Mr. Reilly
10     holding his phone up to it where he could be taking a
11     photograph of it.
12              MR. GHOSE:  That's all I have.  Thank you.
13                          --   --   --
14                      CROSS-EXAMINATION
15     BY MR. SADOW:
16     Q.   You are an ATF agent; correct?
17     A.   Yes, I am.
18     Q.   Not a forensic examiner or a financial analyst, but an
19     ATF agent?
20     A.   That is correct.
21     Q.   Okay.  So let me show you Defense Exhibit No. 1, and
22     tell me, if you can, what that form is?
23     A.   This is a firearms trace summary that was produced
24     through one of our computer systems when we put property into
25     our processing program that traced the firearm that was
```

1    purchased on March 19th, 2014.

2    Q.    Okay.  Who puts that information into the computer?

3    A.    In this situation, I put this firearm into our database,

4    and then the form is automatically generated through the

5    tracing center.  I believe there is a batch download at the

6    end of each day to our tracing center of firearms that had

7    just been placed into evidence, and then they take that

8    information and then they put it all together and do a

9    report.

10   Q.    Okay.

11   A.    Trace summary.

12   Q.    And what are the different categories that you have

13   there?

14         MR. SADOW:  If I could go stand with him, it will

15   make this easier?

16         THE COURT:  All right.

17   BY MR. SADOW:

18   Q.    At the very top you have firearm information, and I'm

19   assuming for the purposes of your examination that that

20   identifies the specific firearm at issue -- that is at issue

21   in that report?

22   A.    Yes, it does.  The Mossberg shotgun.

23   Q.    And then it has recovery information; correct?

24   A.    Yes, it does.

25   Q.    And in the recovery information, it has the recovery

1   date; correct?

2   A.   Yes.

3   Q.   And what date does it have?

4   A.   March 19th, 2014.

5   Q.   And it has the location of the recovery?

6   A.   Yes, it does.

7   Q.   And what location does it have?

8   A.   1901 Niskey Lake Road, Atlanta, Georgia.

9   Q.   Okay.  And it has the possessor of the firearm;

10  correct?

11  A.   It has the possessor on there as Curel Rhonda Taylor.

12  Q.   And who put that in there?

13  A.   As I said, I put information into our database, and it

14  is generated from the tracing center.

15       I believe that in this specific situation, I had

16  multiple possessors, and it probably just popped the top one

17  out, the computer program did.

18  Q.   Are you suggesting that you did not put the possessor as

19  being Ms. Taylor?

20  A.   I'm suggesting I put in two possessors, Mr. Reilly and

21  Ms. Taylor.  And in this situation, it only pulled out

22  Ms. Taylor's name.

23  Q.   All right.  Is there any way for you to show us some

24  kind of record which would reflect that you put in

25  Mr. Reilly's name?

1    A.    Not that I'm aware of, no.

2    Q.    Because in the purchaser information, you have

3    Ms. Taylor; correct?

4    A.    Yes.

5    Q.    And you have Ms. Taylor -- in the recovery information

6    as possessor, you have Ms. Taylor's date of birth; correct?

7    A.    Well, that is what is displayed on the form.

8    Q.    Okay.  So isn't the fact that you indicated that the

9    recovery information possessor is Ms. Taylor because that is

10   exactly what you believed, that she is the possessor of the

11   firearm?

12         MR. GHOSE:  Objection, Your Honor.  I think he

13   already answered this question.

14         THE COURT:  Sustained.

15   BY MR. SADOW:

16   Q.    So I won't be able to find a form in which there would

17   be two possessors listed; correct?  Is that your testimony?

18   A.    I don't believe so.  I don't believe that there will be

19   two possessors listed on a form.

20   Q.    You are sure?

21   A.    I don't believe so, no.

22   Q.    Okay.  Let's go to Government's Exhibit No. 8, and let's

23   go to page 38.

24         If I understand correctly -- and I'm looking at the

25   entries at least on my copy would be the entries No. 4, No. 5

1    and No. 6, do you see those?  The first entry I'm looking for

2    is the one that is 08/03/14, and then there is a time

3    underneath it.  Do you see it?

4    A.    Yes.

5    Q.    And that's Greenwich time, so wouldn't we have to

6    backtrack four hours?

7    A.    Yes.

8    Q.    So we are talking about at approximately 13:36:29, which

9    would be, what, a little after 1:30 in the afternoon, the

10   phone number which is indicated 404-394-1828 sends a text --

11   or I'm sorry, an instant message to the phone number

12   706-346-3817; correct?

13   A.    Yes.

14   Q.    All right.  Now, to be fair, you have identified the 404

15   as the defendant's Apple phone -- that is, at least an Apple

16   phone the defendant had with him when he was arrested on the

17   19th of March; correct?

18   A.    Yes.

19   Q.    And you believe the 706 to be a phone number associated

20   with Ms. Taylor?

21   A.    Yes.

22   Q.    Now, we are sure that this is March the 14th -- I'm

23   sorry, March the 8th; correct?

24   A.    Based on information provided in the report.

25   Q.    Okay.  Well, that's not August the 3rd, because it

1   couldn't be August the 3rd because we are not there yet;

2   right?

3   A.   Correct.

4   Q.   So it would have to be 3-08-14, March 8th; right?

5   A.   Yes.

6   Q.   So through your investigation, now that you have this,

7   what attempt do you know was made by Ms. Taylor either on the

8   8th, the 9th, the 10th, the 11th, the 12th, 13th, 14th, 15th,

9   16th, 17th, 18th, including the 19th of March, to go to buy

10   an assault rifle?

11   A.   To buy an assault rifle?

12   Q.   Yes.

13   A.   I know of none.

14   Q.   None, right?

15        And in fact, when Ms. Taylor went to the Arrowhead Pawn

16   Shop for the first occasion on March 13th, 2014, there was no

17   conversation or inquiry about an assault rifle at all;

18   correct?

19   A.   Not that I'm aware of.

20   Q.   In fact, there is a report that was done -- it would

21   appear to have been done by you that is dated on the 13th,

22   that is, the date of the investigation, and it talks about

23   you receiving information from an employee of an Arrowhead

24   Pawn Shop that Ms. Taylor had initiated a background check in

25   an attempt to purchase two FN pistols; correct?

```
1    A.    That was actually another agent who did that report.

2    Q.    I'm sorry, what was your last name?

3    A.    Sedberry.

4    Q.    I just want to make sure.  Maybe I'm reading it wrong.

5          Who prepared that?

6    A.    Okay.  I thought this was the earlier one.

7    Q.    It is the earlier one.  This is the one from March the

8    13th.

9    A.    Okay.  I did prepare it, but as you see, the information

10   was received by Mr. Southall.

11   Q.    Right.  But you prepared the report; right?

12   A.    Yes.

13   Q.    And that was for two pistols?

14   A.    Correct.

15   Q.    Not an assault rifle?

16   A.    Two 57 pistols.

17   Q.    And then on March the 19th, which is the date of arrest

18   and the date of purchase of two firearms, there was not an

19   assault rifle; correct?

20   A.    No.

21   Q.    A shotgun -- I mean, you are an ATF agent.  A shotgun is

22   not an assault rifle; correct?

23   A.    No.  It was a tactical shotgun that was purchased.

24   Q.    All right.  Now, when you interviewed Ms. Taylor or you

25   were present or had information from Ms. Taylor, who did she
```

1    tell you had come up with the idea for the Mossberg shotgun?

2    A.   She did not tell me personally.

3    Q.   Who did -- there is a report, is there not --

4    A.   Yes.

5    Q.   -- that you wrote in which you reported in Paragraph 48

6    that Special Agent McLeod, if I am pronouncing that right?

7    A.   McLeod.

8    Q.   McLeod, I'm sorry.  It's M-c-L-e-o-d, McLeod.

9         What did McLeod tell you that Ms. Taylor said about the

10   shotgun?

11   A.   She told -- he told me that she advised him that

12   Mr. Reilly had paid for the shotgun -- provided money to pay

13   for the shotgun.

14   Q.   Now, when you looked at the video, the money in fact

15   came out of Ms. Taylor's pocketbook; correct?

16   A.   That is correct.

17   Q.   And it was paid for in addition with a debit card by

18   Ms. Taylor; correct?

19   A.   I'm not completely sure about that, but the video shows

20   the money.

21   Q.   The video doesn't show a debit card?

22   A.   I didn't see the debit card in the video.

23   Q.   Wasn't there a part of the purchase which -- I'm certain

24   you must have the amount of the purchase by the debit card --

25   was $586.30?  Isn't that correct?

1    A.    I'm not sure exactly, no.

2    Q.    All right.  Well, let's go back again to this thing

3    about the shotgun.  Who did Ms. Taylor say to Special Agent

4    McLeod who said to you came up with the idea of the Mossberg

5    shotgun?

6    A.    I believe it was Mr. Reilly.

7    Q.    If you will look at 48, Paragraph 48, see if you agree

8    with me that it reads Special Agent McLeod asked who picked

9    out the specific guns, and she stated Reilly picked out the

10   FN pistol, and the gun store employee talked them into buying

11   the Mossberg shotgun.

12        Isn't that in fact what it says?

13   A.    That is correct.

14   Q.    And is that in fact what Mr. McLeod told you?

15   A.    Yes, it is.

16   Q.    Have you interviewed the federal licensee, Mr. --

17   Philip -- I will not use his last name for purposes -- from

18   the pawn shop about whether he suggested --

19   A.    I talked to him briefly.

20   Q.    So the answer --

21   A.    I have not conducted an interview, but I talked to him

22   briefly on the telephone.

23   Q.    Have you asked him whether he suggested the purchase of

24   the shotgun?

25   A.    I talked to him about the transaction, and he told me

1    that he was very vague.  He could vaguely recall the

2    transaction due to the fact that he had been sick the entire

3    week and had been on medication for bronchitis.  That was the

4    only day that he had worked.

5         I tried to ask him specific questions about the

6    transaction, and he was unable to provide me with any

7    information.  And this was yesterday.

8         And he said that he would try to think about it.  And

9    I told him I would come back and show him the video, it may

10   refresh his memory of the transaction.

11   Q.   Okay.  So you interviewed Philip yesterday?

12   A.   As I said, just briefly.  I spoke to him on the phone

13   for about five minutes.

14   Q.   What time was that yesterday?

15   A.   Yesterday afternoon.

16   Q.   Was that after I had the conversation with the

17   prosecutor in which I told the prosecutor that Philip had

18   suggested the shotgun?

19   A.   I believe it was.

20   Q.   And when you brought that up to Philip, Philip said he

21   just has no memory, he's not feeling well, and he doesn't

22   remember?

23   A.   That's what I said, he said he did not recall.

24   Q.   All right.  Let's talk about Philip a little further.

25        Philip had provided information to ATF prior to this

```
 1   transaction; correct?

 2   A.   Prior to the transaction?

 3   Q.   Yes.

 4   A.   No.

 5   Q.   Philip had never provided information before?

 6   A.   He provided information during the transaction.

 7   Q.   Okay.  I'm specifically asking --

 8            THE COURT:  You mean on other occasions?

 9            MR. SADOW:  On other occasions, correct.

10   A.   Pertaining to this investigation?

11   Q.   No, nothing to do with this investigation.

12   A.   He has never provided me with information to an

13   investigation.

14   Q.   I am asking whether Philip has provided the ATF

15   information in other investigations?

16   A.   Not that I'm aware of.

17   Q.   Okay.  Has Arrow Pawn Shop?

18   A.   Yes, they have.

19   Q.   Does Arrow Pawn Shop receive any benefit for providing

20   information to the ATF?

21   A.   No, they do not.

22   Q.   They don't receive any money?  No one gets any

23   remuneration whatsoever?

24   A.   No, they do not.

25   Q.   Under any set of circumstances?
```

1    A.    Under any set of circumstances.

2    Q.    Okay.  And how often has Arrow Pawn Shop sent or

3    communicated with the ATF on other investigations?

4    A.    We have received information from Arrowhead Pawn Shop on

5    numerous occasions about numerous investigations.

6    Q.    In which they thought there was something suspicious

7    about the nature of the transaction; correct?

8    A.    Yes.

9    Q.    And how many of those turned out to be inaccurate?  A

10   fair sum; right?

11   A.    I couldn't tell one way or another.

12             THE COURT:  We are getting a bit far --

13             MR. SADOW:  We are, Your Honor.  I agree.

14             THE COURT:  This is not a deposition.

15             MR. SADOW:  I will move on.

16   BY MR. SADOW:

17   Q.    The gold that was referenced in your direct examination,

18   purchase of gold, sounded like gold bars?

19   A.    Yes.

20   Q.    Was how much, forty thousand dollars?

21   A.    Approximately.  That's my understanding, yes.

22   Q.    And that's your understanding because who told you?

23   A.    I received it from our financial forensic auditor.

24   Q.    I'm sorry?

25   A.    From Ms. Morgan, who you spoke with earlier, was on the

1    stand earlier today.

2    Q.    She told you about forty thousand dollars in gold?

3    A.    Yes.

4    Q.    Okay.  Didn't Mr. Reilly also say that to you?

5    A.    He told agents during an interview that he had purchased

6    approximately eight thousand dollars' worth of gold from

7    Time Square, but he had since sold that gold.

8    Q.    And the photo that you pointed out on Government's

9    Exhibit No. 8, you believe that to be the gun case?

10   A.    Yes, that is a photo of an FN gun case, handgun case.

11   Q.    And is it the FN handgun case connected to this FN

12   handgun?

13   A.    I would believe so based on the fact that it appears he

14   takes a photograph of it on the video from the pawn shop.

15   Q.    Well, what about the shotgun?  Does he take a photo of

16   the shotgun?

17   A.    There is not a photograph of the shotgun on his phone.

18   Q.    Okay.  Have you attempted to take fingerprints off of

19   the shotgun?

20   A.    I have not.

21   Q.    Do you know whether that's in the process of being

22   done?

23   A.    Currently it is not.  I have not submitted it for

24   processing, no.

25   Q.    Would you agree with me on the video that it is never

1   touched by Mr. Reilly?

2   A.   Mr. Reilly is very comfortable not to touch the shotgun

3   when it is being shown to him, so I would agree with you.

4   Q.   But if I remember, part of what had come up was

5   something along the line of when the shotgun is basically

6   offered to Mr. Reilly, he doesn't touch it.  He kind of backs

7   up a little; right?

8   A.   When I watched the video, it almost appeared that he put

9   his hands in his pockets to not to touch it.

10  Q.   But then when it's in a box and it is sitting out on the

11  counter and they are getting ready to leave, he does carry it

12  out; right?

13  A.   Yes, he does.

14  Q.   Okay.  Now, the prosecutor suggested that the first,

15  when he puts his hands in his pocket and doesn't touch it, is

16  indicative of a straw purchase; correct?

17  A.   Yes, he said that.

18  Q.   Okay.  Then why would he pick it up and carry it out?

19  A.   I can't answer that.

20           MR. GHOSE:   Objection.

21           THE COURT:   Overruled.

22           MR. SADOW:   That's all I have, Your Honor.

23           THE COURT:   Shall the witness step down?

24           MR. GHOSE:   Yes, Your Honor.  I have nothing

25  further.

1          THE COURT:  Thank you.

2          THE WITNESS:  Exhibits, leave here?

3          THE COURT:  Just leave the exhibits there.

4          Do you have any other witnesses?

5          MR. GHOSE:  I do not, Your Honor.

6          THE COURT:  Let's take a ten-minute break.

7               (A recess is taken at 11:37 a.m.)

8                    --  --  --

9               (In open court at 12:01 p.m.:)

10         THE COURT:  All right.  So is that all for the

11   government, then?

12         MR. GHOSE:  Yes, Your Honor.

13         THE COURT:  All right.  Mr. Sadow?

14         MR. SADOW:  Yes, Your Honor.  I would like to call

15   Rhonda Marie Augustine, please.

16          (The oath is given by the Courtroom Deputy Clerk.)

17         THE CLERK:  Be seated, and state your full name for

18   the record and spell your last name, please?

19         THE WITNESS:  Rhonda Marie Augustine,

20   A-u-g-u-s-t-i-n-e.

21         THE CLERK:  Thank you.

22                    --  --  --

23               RHONDA MARIE AUGUSTINE

24     being first duly sworn by the Courtroom Deputy Clerk,

25               testifies and says as follows:

```
1                        --   --   --

2                     DIRECT EXAMINATION

3    BY MR. SADOW:

4    Q.    And, Ms. Augustine, where do you presently reside?

5    A.    7873 Heathmore Avenue, Fairburn, Georgia.

6    Q.    How long have you resided at that specific address?

7    A.    I just recently leased in April.

8    Q.    When you say recently, can you give us a time frame of

9    how recently?

10   A.    The second week in April, April 18th.

11   Q.    Okay.  So we are talking about within the last month or

12   so?

13   A.    Yes, sir.

14   Q.    Prior to moving to that address in April, where did you

15   reside?

16   A.    I have a house at 6980 Hassana Lane, Fairburn, Georgia

17   30213.

18   Q.    When you say you have a house there, you own a home

19   there?

20   A.    Yes.  I have been owning it for 22 years.

21   Q.    When did you purchase it?

22   A.    August of 1991.

23   Q.    All right.  Who now lives in that address, the Hassana

24   address?

25   A.    My mother and my brother.  They have been living there
```

1    too for 22 years.

2    Q.   And if the Court saw fit to release Mr. Reilly on bond,

3    would you allow him to live with you at 7873 Heathmore

4    Avenue, Fairburn, Georgia?

5    A.   Oh, yes, I will.

6    Q.   Is there anyone else living with you at this time?

7    A.   Curel Taylor and Kiana Carter.

8    Q.   And who is Curel Taylor?

9    A.   Curel is my daughter, and Kiana is my granddaughter.

10   Q.   That is Curel's daughter?

11   A.   Yes, uh-huh.

12   Q.   And how long has Curel been living with you at this

13   address?

14   A.   She moved in when I moved in.

15   Q.   So we are talking about in April?

16   A.   Uh-huh.

17   Q.   Okay.

18             MR. SADOW:  That's all.

19             THE COURT:  Any questions?

20             MR. GHOSE:  Just a couple questions

21                         --  --  --

22                    CROSS-EXAMINATION

23   BY MR. GHOSE:

24   Q.   The new address that you moved into, is it 7873

25   Heathburn Avenue?

```
 1    A.    Seventy --

 2    Q.    7873 Heathburn Avenue?

 3    A.    Yes.

 4    Q.    Is that an apartment or a house?

 5    A.    No, it's a five-bedroom home.

 6    Q.    It's a five-bedroom home?

 7    A.    Uh-huh.

 8    Q.    And have you taken out a lease for that home?

 9    A.    We have the lease agreement, uh-huh.

10    Q.    Is it for a period of time?

11    A.    For one year.

12    Q.    Okay.  And do you or Ms. Taylor work during the day?

13    A.    Do I work?

14    Q.    Do you or your daughter work during the day?

15    A.    Yes.  I have been working for Fulton County government

16    for the past 18 years.

17    Q.    And then what about your daughter, Ms. Taylor, does she

18    go to work during the day?

19    A.    She be doing her hair business.

20    Q.    Outside of the home?

21    A.    Uh-huh.

22    Q.    So no one else is at home during the day?

23    A.    No, but I work in the field, so I'm in and out.  I'm an

24    appraiser for the county, so --

25    Q.    And how old is your granddaughter?
```

1  A.   She be 13.

2  Q.   Okay.  And she goes to school during the day?

3  A.   Yes, uh-huh.

4  Q.   Is there a working phone line?

5  A.   Is there a working number?  Yeah, I have my job number

6  and my cell phone number.

7  Q.   But there is a working home line there?

8  A.   Oh, there is a working home line as well.

9           MR. GHOSE:  Okay.  I don't have any further

10  questions, Your Honor.

11           THE COURT:  You may step down, ma'am.

12           THE WITNESS:  Yes, ma'am.

13           MR. SADOW:  That's the evidence from the

14  defendant.

15           THE COURT:  Okay.  So I have all the evidence from

16  both sides at this point?

17           MR. SADOW:  I believe all of my exhibits have been

18  tendered.

19           THE COURT:  Okay.  Now, we did have some testimony

20  come in from -- and I'm sorry, I don't remember the name of

21  the lady that testified.

22           Who was our first witness, Vicki?

23           THE CLERK:  Christa Morgan.

24           THE COURT:  Ms. Morgan, she did give some

25  testimony, and I did say that they were going to have to turn

1    over to the defense any documents that were used in coming up

2    with the figures that she came up with, and I'm prepared to

3    stand by that.

4           I cannot continue this hearing tomorrow.  I will be

5    out of town, and I will not be back until Tuesday

6    afternoon.

7           Can we finish this Tuesday afternoon, Vicki, or --

8           THE CLERK:  Yes.  You don't have anything.

9           THE COURT:  All right.  So what about that, we

10   finish up this hearing Tuesday at let's say 2:00?

11          MR. SADOW:  I would have to move something around,

12   but I could certainly do so.

13          THE COURT:  Okay.  You want to commit to that?

14          MR. SADOW:  Well, I guess the answer to that is if

15   they -- respectfully, my language -- dump boxes of material

16   on me on Tuesday morning --

17          THE COURT:  Right.

18          MR. SADOW:  -- or Monday afternoon, I would still

19   have the need to go through those.

20          THE COURT:  Well, I don't know how -- I did

21   understand that there are boxes of materials that the ATF

22   has.  I do not know if all of those boxes were used to come

23   up with the cash estimates that were the subject of the

24   testimony.

25          So I have to kind of look at the government and

```
 1    say, you know, how soon can you get that stuff to Mr. Sadow?

 2              MR. GHOSE:  If I could just consult with my agent,

 3    Your Honor?

 4              THE COURT:  All right.

 5              MR. GHOSE:  Your Honor, I have spoken with the ATF,

 6    and we could have those ready for defense counsel by the end

 7    of the day tomorrow, if that would be sufficient?

 8              THE COURT:  You will actually deliver them to his

 9    office by the end of the day tomorrow?

10              MR. GHOSE:  It could be earlier, but I think if we

11    could have till the end of the day tomorrow, we could --

12              THE COURT:  That is, until 5:00?

13              MR. GHOSE:  Until 5:00, yes, I think we could do

14    that.  Or it might be actually quicker -- well, he could

15    either pick it up at the ATF offices or we could bring it to

16    his office, but we would have the boxes --

17              THE COURT:  Why don't you take it to his office,

18    unless he prefers to go to --

19              MR. SADOW:  I think my office would be easier for

20    me.

21              And are we talking about a number of boxes of

22    records?

23              MR. GHOSE:  It would probably be just one file-size

24    box of documents, one box, which is the underlying records

25    that relate to the two summaries that were discussed in the
```

1    hearing today.

2              THE COURT:  And which were the subject of the

3    witness's testimony.

4              MR. GHOSE:  Exactly, that's correct.

5              THE COURT:  Okay.

6              MR. SADOW:  I don't want to get into a position

7    where I begin to complain unnecessarily, but will these

8    records actually show us dates of cash deposits, that type of

9    thing, or will it be something still somewhat amorphous and

10   will not give that information?

11             MS. MORGAN:  It will have bank statements and

12   underlying deposit slips and withdrawal slips, so you will be

13   able to see dates for sure.

14             THE COURT:  Okay.

15             MR. SADOW:  Okay.

16             THE COURT:  All right.  Anything else for today?

17             MR. SADOW:  Well, I guess my question -- I'm

18   sorry.

19             MR. GHOSE:  I don't have anything else other than

20   since it's been a lengthy hearing just a chance to recap my

21   argument, if I could?  But I could do that at the end of

22   the --

23             THE COURT:  Yeah, let's wait till the end.

24             MR. GHOSE:  Okay.

25             MR. SADOW:  This may be presumptious, and I

1    apologize if it is.  But I'm assuming the Court wants that

2    information before it makes a final decision on whether bond

3    should be granted?

4           THE COURT:  Well, I want to hear what you have to

5    say about it.  Do you understand what I'm saying?  You are

6    going to get the documents.

7           And I guess you will need to have the witness

8    available in case Mr. Sadow wants to ask her some additional

9    questions.  But, you know, I'm just waiting to see what the

10   defense wants to offer at this point.

11          MR. SADOW:  *Vis-a-vis* those documents and that

12   evidence?

13          THE COURT:  Correct.

14          MR. SADOW:  Okay.  And the only other thing I would

15   point out, I assume that if we finish it Tuesday, we are

16   still in a position where one could attend a wedding

17   theoretically on May 17th.  So --

18          THE COURT:  All right.  Thank you.

19          MR. SADOW:  Thank you.

20               (Proceedings adjourn at 12:10 p.m.)

21

22

23

24

25

1                    C E R T I F I C A T E

2

3    UNITED STATES OF AMERICA        :
                                      :
4    NORTHERN DISTRICT OF GEORGIA   :

5            I, Nicholas A. Marrone, RMR, CRR, Official Court

6    Reporter of the United States District Court for the Northern

7    District of Georgia, do hereby certify that the foregoing 75

8    pages constitute a true transcript of proceedings had before

9    the said Court, held in the city of Atlanta, Georgia, in the

10   matter therein stated.

11           In testimony whereof, I hereunto set my hand on

12   this, the 8th day of May, 2014.

13

14

15

16                           */s/ Nicholas A. Marrone*

17                        _____
                             NICHOLAS A. MARRONE, RMR, CRR
18                           Registered Merit Reporter
                             Certified Realtime Reporter
19                           Official Court Reporter
                             Northern District of Georgia
20

21

22

23

24

25