IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

DESHAWN REILLY &
CUREL TAYLOR

Criminal Action No.

1:14-cr-00146-ODE-GGB

GOVERNMENT'S POST-SUPPRESSION HEARING OPENING BRIEF

The United States of America, by John A. Horn, Acting United States

Attorney for the Northern District of Georgia, and John S. Ghose and William G.

Traynor, Assistant United States Attorneys, files this post-hearing opening brief[1]

in order to outline the evidence presented at the suppression hearings, held on

August 21, 2014, and October 24, 2014,[2] as they pertain to the issues raised in the

defendants' suppression motions.  As explained below, the evidence presented at

---

[1] The post-hearing briefs for Defendants Deshawn Reilly and Curel Taylor are due on March 12, 2015.  The Government's reply brief is due on March 26, 2015. On August 20, 2014, the government filed a pre-hearing memorandum outlining the issues expected to be raised at the evidentiary hearing.  (Doc. 60).

[2] The transcripts for the August 21, 2014 and October 24, 2014 evidentiary hearings are available at docket item nos. 64 and 68, respectively.  The transcript page numbering is consecutive, with pages 1 through 226 covering the August 21st hearing, and pages 227 through 426 covering the October 24th hearing.  The government will cite witness testimony in this brief by using the notation "Tr." followed by the appropriate page number or page range, without reference to the date of the hearing.  The suppression hearing exhibits referenced in this brief are attached hereto.

the evidentiary hearings makes clear that none of evidence in this case should be suppressed.

### I.    PROCEDURAL HISTORY

On March 19, 2014, Deshawn Reilly was arrested by ATF agents, at 1901 Niskey Lake Road, SW, Atlanta, Georgia, for his role in a suspected straw purchase of two firearms; the illegal possession of four firearms; and the possession of marijuana with the intent to distribute.  The following day, on March 20, 2014, Reilly was charged in the Northern District of Georgia by criminal complaint for a violation of 18 U.S.C. § 922(g)(1) (felon-in-possession of a firearm).  Reilly was ordered detained awaiting trial, and that detention order, which was appealed, was affirmed by the district court.

On April 23, 2014, a NDGA grand jury returned an indictment charging Reilly with one count of felon-in-possession of a firearm.  On May 9, 2014, Reilly filed an initial motion to suppress all evidence and statements that were obtained in violation of his Fourth, Fifth, and Sixth Amendment rights.  (Doc. 23).

On June 25, 2014, a NDGA grand jury returned a superseding indictment charging the following crimes, all of which took place on March 19, 2014:  (1) Count One, charging Reilly and his then-fiancée (now wife), Curel Taylor, with straw purchase of two firearms (a Mossberg shotgun and a FN pistol), in violation of 18 U.S.C §§  924(a)(1)(A) and 2, at the Arrowhead Pawn Shop, in Jonesboro, Georgia; (2) Count Two, charging Reilly with felon-in-possession of two firearms  (Mossberg shotgun and FN pistol); (3) Count Three, charging Reilly with felon-in-possession of two other firearms (a Kel-Tec Pistol and a Glock pistol); and (4) Count Four, charging Reilly with possession of marijuana

2

with intent to distribute, in violation of 18 U.S.C. § 841(a)(1)&(b)(1)(D).  Shortly thereafter, Taylor voluntarily surrendered to the U.S. Marshals, made her initial appearance on the superseding indictment, and was granted a bond.

On July 14, 2014, Taylor filed a motion to suppress all evidence and statements obtained in violation of her Fourth, Fifth, Sixth, and Fourteenth Amendment rights.  (Doc. 46).  Specifically, Taylor asserted four specific claims: First, Taylor asserts that the tangible evidence seized during the consent search of her home at 1901 Niskey Lake Road in the afternoon of March 19, 2014, should be suppressed because the consent that she gave to the investigating agents was not voluntary.  Second, Taylor asserts that that the tangible evidence seized from her home at 1901 Niskey Lake Road later in the evening of March 19, 2014, should be suppressed because the state search warrant that authorized that search was invalid for two reasons: (a) the information asserted in the supporting affidavit was acquired during an unlawful consent search; and (b) the judge who signed that search warrant was not authorized to do so.[3]  Third, Taylor asserts that the electronic evidence seized during the consent search of her two cell phones, which were searched electronically in the afternoon of March 19, 2014, on-site at 1901 Niskey Lake Road, should be suppressed because the consent that she gave to the investigating agents was not voluntary.  Fourth, Taylor asserts that statements that she gave to investigating agents in the afternoon and

---

[3] Defense counsel asserted at the conclusion of the second suppression hearing that they do not intend to further pursue this argument regarding the judge's purported lack of authorization to sign the state search warrant.  (Tr. at 423.)

evening of March 19, 2014, at 1901 Niskey Lake Road, should be suppressed because the waiver of her *Miranda* rights was not knowing and voluntary.

On July 22, 2014, Reilly filed an amended motion to suppress evidence and statements in violation of his Fourth, Fifth, and Sixth Amendment rights. (Doc. 49). In his motion, Reilly also asserts four specific claims: First, Reilly asserts that the tangible evidence (including cell phones) seized from his person during his detention in the afternoon of March 19, 2014, while in the driveway of 1901 Niskey Lake Road, was illegal under the Fourth Amendment because there was no reasonable suspicion or probable cause for the agents' to detain him in the first instance. Second, Reilly asserts that his statements to agents' in the afternoon and evening of March 19, 2014, at 1901 Niskey Lake Road, should be suppressed as the fruit of an unlawful stop that was not cured by subsequent *Miranda* warnings. Third, Reilly asserts that the tangible evidence seized during the consent search of the residence at 1901 Niskey Lake Road, which he shared with co-defendant Taylor, was invalid because the consent that Taylor gave to the agents was not given freely and voluntarily. Fourth, Reilly asserts that the electronic evidence seized during the searches of his three cell phones should be suppressed because: (a) his consent for the electronic search conducted in the afternoon of March 19, 2014, on-site at 1901 Niskey Lake Road, was not given freely and voluntarily; and (b) the electronic search conducted later, pursuant to a federal search warrant dated May 30, 2014, was based on information acquired during the initial purportedly unlawful consent search noted above.

This Court held evidentiary hearings on August 21, 2014, and October 24, 2014. At the first hearing, the government called four ATF agents to testify: SA

Gabriel Brooks, SA Steve Kosch, TFO William Johnson, and SA Benjamin Southall.  At the second hearing, the government called three additional ATF agents to testify:  SA Nicolas DeGennaro, SA Jonathan Gray, and SA Charles Sedberry.  The defense called one witness, at the second hearing:  "C.Y.," an employee of Arrowhead Pawn Shop.

## II.   SUMMARY OF THE EVIDENCE

In summarizing the evidence for the Court, the Government will cite the most relevant portions of the hearing transcripts that show that none of the issues raised by the defendants in this case warrant suppression of any evidence.  The following chart helps to illustrate generally the issues raised by defendants, which the Government will address in turn below:

| ISSUE | Taylor | Reilly |
|---|---|---|
| Validity of *Terry* stop on driveway | | X |
| Validity of consent to search residence | X | |
| Validity of consent to search cell phones | X | X |
| Validity of consent to speak with agents before arrest | X | X |
| Validity of *Miranda* waiver after arrest | X | X |

### A. Validity of *Terry* Stop

Reilly claims that there was insufficient reasonable suspicion for the agents to conduct a *Terry*[4] stop on the driveway of his home, at 1901 Niskey Lake Road, shortly after 2:00 p.m. on March 19, 2014.  Reilly makes a similar derivative

---

[4] *Terry v. Ohio,* 392 U.S. 1 (1968) (holding it acceptable under the Fourth Amendment for police to briefly stop and detain persons for whom they have reasonable suspicion they might be engaged in criminal activity or about to do so).

argument by asserting that his statements to the agents after the *Terry* stop should be suppressed as the fruit of an unlawful stop that was not based on reasonable suspicion or probable cause.

These claims fail, however, because SAs Southall and Sedberry explained at the second evidentiary hearing that the ATF had already gathered sufficient evidence inculpating Reilly with at least the federal offense of felon-in-possession of a firearm at the time they approached him in his driveway for questioning. Indeed, the agents had already researched Reilly's criminal history, confirmed that he was a twice-convicted felon, and observed him carrying a Mossberg shotgun. Although Reilly's actual possession of the shotgun was brief, fleeting possession is sufficient to satisfy a violation under 18 U.S.C. § 922(g)(1). *United States v. Pond*s, 499 Fed. Appx. 204, 206, 2012 WL 4335969, *2 (3d Cir. 2012); *see also United States v. Mercado*, 412 F.3d 243, 251 (1st Cir. 2005) (evidence that a defendant "held the firearm for a few seconds" could properly support a § 922(g) conviction); *United States v. Palma*, 511 F.3d 1311, 1316 (11th Cir. 2008) (noting that the 11th Circuit does not recognize "innocent transitory possession" defense, and specifically rejecting the argument that a jury should have been instructed on that defense in a case very similar to the instant case).

A law enforcement officer can stop and briefly detain a person for investigative purposes—make a *Terry* stop—if the officer has a reasonable suspicion supported by articulable facts that the person has engaged in, or is about to engage in, criminal activity. *Terry v. Ohio,* 392 U.S. 1 (1968); *United States v. Sokolow*, 490 U.S. 1, 7 (1989); *see also United States v. White*, 593 F.3d 1199, 1202 (11th Cir. 2010). "Reasonable suspicion" is a less demanding standard than

probable cause, but it requires "at least a minimal level of objective justification for making the stop." *United States v. Gordon*, 231 F.3d 750, 754 (11th Cir. 2000) (citations and quotations omitted). A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity. *Id*.

To determine whether the police had reasonable suspicion to make a stop, a court must look at the totality of the circumstances. *United States v. Arvizu*, 534 U.S. 266, 273 (2002). This standard permits officers to draw on their experience and specialized training to make inferences and draw deductions that might elude a lay person. *Id.* The *Terry* review of the totality of the circumstances precludes a "divide-and-conquer" analysis that focuses on and dismisses each circumstance of a stop in isolation. *Id.* at 274. Moreover, courts give "great deference" to the judgment of trained law enforcement officers "on the scene." *United States v. Griffin*, 696 F.3d 1354, 1360 (11th Cir. 2012) (citation and quotation omitted).

The totality of the circumstances in this case show that the ATF agents had reasonable suspicion to believe that: (1) Reilly had unlawfully possessed at least one firearm as a convicted felon; and (2) Reilly had done so in the course of conducting a straw purchase of a firearm with Taylor.

SA Southall testified that he first learned of a possible straw purchase—*i.e.*, a permitted purchaser buying a firearm for someone else, usually a prohibited person —on Thursday, March 13, 2014. (Tr. at 168, 170). On that day, an employee at Arrowhead Pawn Shop, in Jonesboro, Georgia, called SA Southall to notify him that a woman (Curel Taylor) was attempting to buy two identical, expensive FN pistols, while accompanied by three other people. (Tr. at 169).

7

This pawn shop employee was not a paid informant or an agent of the ATF, and had been a consistent source of reliable information over several years.  (Tr. at 29-31, 171, 252, 266).  SAs Southall and Sedberry explained that a person buying identical guns at the same time can indicate a potential straw purchase scenario. (Tr. at 170, 374).  Specifically, a person buying two identical firearms at the same time "indicates that they may be purchasing one for themselves, one for someone else, or both firearms for someone else."  (Tr. at 374).  When Taylor's name was queried by ATF, SA Sedberry learned that a Taurus 9mm handgun purchased by Taylor elsewhere had recently been recovered by law enforcement in Fairburn, Georgia.  (Tr. at 376).

On Monday, March 17, 2014, a pawn shop employee called Taylor to tell her that her background check was complete, and that she could purchase her guns. (Tr. at 172).  A message was left for her since Taylor did not pick up her phone. (Tr. at 172).  A few moments later, when Taylor called back, the store's caller identification showed that she was calling from a phone line subscribed to Deshawn Reilly.  (Tr. at 173, 192-93).  SA Sedberry ran a criminal background check on Reilly and learned that he was a convicted felon prohibited by federal law from purchasing firearms.  (Tr. at 173, 379).

SA Southall set up surveillance at the pawn shop the following day, but Taylor did not show up.  (Tr. at 173).  On March 19, 2014, while SAs Southall and Sedberry were near the store, they received a call from a pawn shop employee who said that Taylor was in the store with another individual (Deshawn Reilly). (Tr. at 173).  The pawn shop clerk told SA Southall what was happening inside the store, *i.e.*, that Taylor was purchasing an FN pistol and a shotgun, and that

Reilly had "picked the shotgun out."  (Tr. at 174).  The clerk explained to SA

Southall that the defendants would be walking out of the store with the pistol in

a white plastic bag, and the shotgun in a white and blue box.  (Tr. at 175).

SA Southall set up outside the store so that he had a good view of the

entrance, approximately 30 yards from the front door.  (Tr. at 175-76).  SA

Southall knew, based on running Reilly's criminal history, that Reilly was six feet

four inches tall, and approximately 230 pounds.  (Tr. at 176).  After Taylor's

purchase of the firearm was complete, SA Southall saw Taylor and Reilly exit the

store, with Taylor carrying the white bag, and Reilly carrying the long blue-and-

white shotgun box.  (Tr. at 176-77).  At this time it appeared to SA Southall that

"there could be a felon [*i.e.*, Reilly] in possession of a firearm."  (Tr. at 177).  SA

Sedberry agreed.  (Tr. at 384-85).

SAs Southall and Sedberry surveilled the defendants' car to ensure that the

guns they had just purchased were not removed from the trunk; followed Reilly

and Taylor to their house at Niskey Lake Road; and then approached them in

their driveway when they reached home.  (Tr. at 55-56, 177).  Under the

circumstances, SA Southall did not "believe [Taylor] bought the guns for

herself," and thus a straw purchase had just occurred.  (Tr. at 206, 224, 385).  SA

Southall's opinion was informed, in part, by the observations made by C.Y.,  the

Arrowhead pawnshop employee who was working on March 13, 2014, when

Taylor initially came into the store.  C.Y. explained that a woman, who turned

out to be Taylor, had entered the store with two or three other males and one

other female and wanted to purchase identical FN five-sevens—expensive and

high-powered pistols that fire rifle rounds.  (Tr. at 232-33, 255, 264-265).  C.Y.

explained that one of the males "was asking about the FN five-seven" and "wanted to show Ms. Taylor," and that "it did not feel like Ms. Taylor was the one who had picked out the FN five-seven, so I in turn called ATF about the sale." (Tr. at 233). C.Y. testified that she was suspicious of the fact that Taylor wanted to buy two identical firearms. (Tr. at 265). SA Sedberry explained that it was common for a woman—whether it be a "girlfriend, fiancée, [or] spouse"—to be the straw purchaser for the prohibited man she was assisting. (Tr. at 373).

The testimony of SAs Southall and Sedberry, who had been in close contact with the other agents regarding their observations, clearly demonstrates that the ATF agents had reasonable suspicion to conduct a *Terry* stop—if not probable cause to arrest[5]—when they approached Reilly and Taylor at 1901 Niskey Lake Road. A number of Eleventh Circuit cases have found reasonable suspicion justifying a *Terry* stop in situations where the totality of the circumstances demonstrated similar, or less, suspicion than in this case. *See, e.g., United States v. Lewis*, 674 F.3d 1298, 1305-06 (11th Cir. 2012) (*Terry* stop valid because reasonable suspicion objectively existed when two of defendant's companions told officers they were carrying concealed weapons); *United States v. Jordan*, 635 F.3d 1181, 1187 (11th Cir. 2011) (reasonable suspicion to stop when officers patrolling area known for narcotics sales observed defendant with a gun-shaped bulge in his

---

[5] Probable cause to arrest exists when "the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed an offense." *United States v. Street*, 472 F.3d 1298, 1305 (11th Cir. 2006). "Whether an officer possesses probable cause . . . depends on the elements of the alleged crime and the operative fact pattern." *Brown v. City of Huntsville*, 608 F.3d 724, 735 (11th Cir. 2010).

pocket, walking down middle of street, yelling belligerently); *United States v. Caraballo*, 595 F.3d 1214, 1222-23 (11th Cir. 2010) (reasonable suspicion to stop because experienced officer knew defendants' mismatched fishing rods on first day of lobster season and quick loading of boat while nervously scanning shoreline suggested illegal lobster fishing); *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (reasonable suspicion to stop based on anonymous tip that was consistent with ongoing investigation of bank robberies in area involving 3-4 black males driving SUVs); *United States v. Talley*, 108 F.3d 277, 281-82 (11th Cir. 1997) (tip from informant reliable because informant provided reliable information in the past and police corroborated informant's description of defendants' vehicle and report that one defendant had bulge in pocket after exiting suspected drug residence).  The Court should not suppress any evidence based on a purported lack of reasonable suspicion for the initial *Terry* stop at 1901 Niskey Lake Road.

## B. Taylor's Consent to Search the Residence

Taylor asserts that the physical evidence seized by the ATF during the consent search of her home at Niskey Lake Road, in the afternoon of March 19, 2014, should be suppressed because the verbal consent she gave to the investigating agents was not voluntary.[6]  Taylor relies primarily on the fact that she refused to sign a written consent form when asked to do so by SA Sedberry. But what Taylor ignores, however, is the clear evidence of her verbal consent to

---

[6] Reilly shared the house at 1901 Niskey Lake Road with Taylor, and he joins her in arguing that the evidence gathered during the searches of their residence—first based on consent, and later by search warrant—should be suppressed.

search her residence, which she first gave to SA Gabriel Brooks, and then later re-affirmed to SA Sedberry, even after she declined to sign the written consent form.[7]

"A warrantless consent search is reasonable and thus consistent with the Fourth Amendment irrespective of the availability of a warrant."  *Fernandez v. California*, 134 S. Ct. 1126, 1137 (2014); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973).  When a warrantless search is justified, requiring the police to obtain a warrant may "unjustifiably interfer[e] with legitimate law enforcement strategies."  *Kentucky v. King*, 131 S. Ct. 1849, 1860 (2001).  Plus "a lawful occupant of a house or apartment should have the right to invite the police to enter the dwelling and conduct a search" because "[s]uch an occupant may want the police to search in order to dispel 'suspicion raised by sharing quarters with a criminal.'"  *Fernandez*, 134 S. Ct. at 1137 (*citing Georgia v. Randolph*, 547 U.S. 103, 116 (2006)).[8]

---

[7] Although not raised squarely, Reilly's defense attorney implied at the evidentiary hearings that Taylor's initial consent to search her residence was tainted by the fact that SA Brooks had unlawfully entered her garage without a warrant.  Such an entry would not necessarily render Taylor's subsequent consent invalid.  *See, e.g., United States v. Gonzalez*, 71 F.3d 819 (11th Cir. 1996) (upholding consent search of a house where the owner consented to the search after being followed into her house by a law enforcement officer).  But in any case, as described below, the evidence shows that the agents were merely on the driveway, at the threshold of an open garage, at the time they were given Taylor's initial consent.

[8] "[T]he voluntary consent of any joint occupant of a residence to search the premises is valid against the co-occupant, permitting evidence discovered in the search to be used against the co-occupant at the criminal trial."  *United States v. Dunkley*, 911 F.2d 522, 525 (11th Cir. 1990).  "The authority which justifies the third-party consent does not rest upon the law of property . . . but rests rather on

A person's waiver of his or her Fourth Amendment rights need not be knowing or intelligent—only voluntary. *Schneckloth*, 412 U.S. at 241. Consent may be express or implied, and can be verbal or in writing. *See United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (consent to search voluntary because suspect handed officer key necessary to open locked duffel bag); *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (consent to enter trailer implied because defendant yielded right of way to officers); *United States v. Dunkley*, 911 F.2d 522, 525-26 (11th Cir. 1990) (consent implied because passenger lessee of rental car remained silent after driver consented to search of vehicle); *Tukes v. Dugger*, 911 F.2d 508, 517-18 (11th Cir. 1990) (consent valid though defendant had low level of education and intelligence and was unable to read or write). Consent to a search which occurs after the search has started may be considered a "ratification" of the search and is effective. *United States v. Reeh*, 780 F.2d 1541 (11th Cir. 1986) (consent of vessel's flag state to search of vessel after search started was valid).

"In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." *United States v. Garcia*, 890 F.2d 355, 360 (11th Cir. 1989). In determining consent, a court looks at the totality of the circumstances. *United States v. Acosta*, 363 F.3d 1141, 1151 (11th Cir. 2004) (citation omitted). A district court looks at several factors to determine the

mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched." *United States v. Camp*, 157 F. App'x 121, 123 (11th Cir. 2005) (quoting *United States v. Matlock*, 415 U.S. 164, 171-72, n. 7 (1974)).

voluntariness of a consent to search, including: (1) whether the individual was free to leave; (2) whether there was coercive police procedure; (3) the extent of the individual's cooperation and awareness of the right to refuse consent; (4) the extent of the individual's education and intelligence; and (5) the individual's belief that no incriminating evidence would be found.  *United States v. Ramirez-Chilel*, 289 F.3d 744, 752 (11th Cir. 2002) (citation omitted).  This list is not exclusive—"the absence of official coercion is a *sine qua non* of effective consent." *Hubbard v. Haley*, 317 F.3d 1245, 1253 (11th Cir. 2003).

The totality of the circumstances in this case make clear that Taylor voluntarily verbally consented to the search of her and Reilly's residence, both when she first began talking with SA Brooks, and later when she re-affirmed her consent with SA Sedberry.

On or around March 12, 2014, about a week before Reilly's arrest, SA Brooks was informed by SA Sedberry of the ATF's investigation into potential straw purchasing by Taylor.  (Tr. at 5).  On March 17 and 18, 2014, SA Brooks assisted SAs Sedberry and Southall with surveillance at the Arrowhead Pawn Shop.  (Tr. at 5).  On Wednesday, March 19, 2014, SA Brooks met SAs Sedberry and Southall in the vicinity of the pawn shop.  (Tr. at 6).  After Taylor and Reilly purchased the FN pistol and Mossberg shotgun, several surveilling agents, including SA Brooks, trailed the white BMW driven by Reilly, with Taylor in the passenger seat, as it made several stops at different businesses.  (Tr. at 7).  At about 2:00 p.m. on March 19, 2014, the white BMW pulled into Taylor's and Reilly's shared home on Niskey Lake Road.  (Tr. at 6-7).  The white BMW parked in the garage of the house, "half in, half out of the garage."  (Tr. at 7, 388).

14

Before Reilly or Taylor could get out of the car or had "the opportunity to do anything" with the firearms they had just purchased from the pawn shop, SA Brooks got out of his car and approached them with his ATF credentials out.  (Tr. at 8).  Reilly had already walked halfway up the driveway towards the street and "was fully aware of [SA Brooks's] presence there."  SA Brooks testified that it "looked like [Reilly] was waiting for us to stop and talk to him."  Taylor was standing "right around the trunk area."  (Tr. at 9).  The trunk was open.  (Tr. at 9).

SA Brooks was wearing street clothes as he approached Reilly and Taylor, but he identified himself as an ATF agent and displayed his ATF credentials.  (Tr. at 9).  He had a firearm with him, but he did not have it out.  (Tr. at 9).  Lights and sirens were not running on the agents' vehicles.  (Tr. at 9).  SA Brooks asked Reilly if he had any guns on him, and Reilly said he didn't, but that "we just bought some; they are still in the car."  (Tr. at 9).

Once SA Brooks had confirmed that Reilly did not have any firearms on him, SA Brooks kept moving up the driveway toward the house to talk with Taylor.  (Tr. at 10).  When SA Brooks reached Taylor, he again identified himself as an ATF agent.  (Tr. 10).  SA Brooks testified that "Ms. Taylor was very cooperative."  (Tr. at 10).  She explained to SA Brooks that she had just purchased two firearms; SA Brooks could see the FN pistol case in the white bag Taylor was holding.  (Tr. at 10-11).  He could also see the white box for the shotgun in the open trunk.  (Tr. at 11).  SA Brooks testified that Taylor was "very willing to show me the firearms and the paperwork" from the gun purchase.  (Tr. at 11).

SA Brooks asked Taylor about both guns; Taylor knew that she had bought a pistol and a shotgun, but could not explain further details, such as the caliber or gauge of the weapons.  (Tr. at 11-12).  SA Brooks found this suspicious.  (Tr. at 65-66).  The tone of this exchange was "casual."  (Tr. at 12).  SA Brooks did not tell Taylor that she was under arrest or that she was not free to leave.  (Tr. at 12).  SA Brooks broke away from his conversation with Taylor, which lasted about a minute, to talk with other ATF agents who were arriving on scene.  (Tr. at 12-13).  SA Brooks had a conversation with Reilly which included a discussion of one of Reilly's prior felony convictions.  (Tr. at 15).  Reilly told SA Brooks that the conviction had been "for marijuana . . . so many pounds of marijuana."  (Tr. at 15).

SA Brooks then "went back with that information and talked to Ms. Taylor" and explained his concerns.  (Tr. at 15).  Taylor "wanted to know what was going on."  (Tr. at 15).  SA Brooks explained that Reilly was known to be convicted felon, for drug trafficking activity, and that he had just been seen carrying a shotgun box out of a gun store.  (Tr. at 15-16).  SA Brooks asked who lived in the Niskey Lake Road house, and Taylor said that Reilly stayed there sometimes, but also spent time in Pennsylvania and Florida.  (Tr. at 16).  SA Brooks testified that, "at that point I asked her [Taylor] if we could search the house with her there, with her walking through with us in the house."  (Tr. at 16).  SA Brooks explained, "[Taylor] has advised that she had two other firearms inside the housed.  I stated that I'd like to see those as well."  (Tr. at 16).  The tone of the exchange was "normal."  (Tr. at 18).  SA Brooks did not threaten Taylor or make any promises to her.  (Tr. at 18).  SA Brooks testified that Taylor then "agreed to

16

take us through the house, search the house."  (Tr. at 16).  SA Brooks did not cross the threshold of the garage or enter the house until after Taylor gave her verbal consent to search.  (Tr. at 106).

SA Sedberry was also present when Taylor consented to search of her residence.  (Tr. at 388).  SA Sedberry explained as follows:

> Agent Brooks was speaking with Ms. Taylor . . . and [said] that he would like her consent to search the house for firearms and narcotics.  And she said that she would help out and that we could search, and she granted her consent.  She said, ["]Sure.  You know, I have nothing to hide.  There's nothing illegal in here.  You're not going to find anything.["]

(Tr. at 388).  SA Sedberry testified further that, "at that point I was like, well, we've got verbal [consent], but I wanted to get the written consent, so I had to run to my car to get a[n] ATF consent form."  (Tr. at 388).  SA Brooks explained that, while written consent is not required for consent, "sometimes it helps for court purposes."  (Tr. at 74).

Because Taylor told the agents that Reilly spent a lot of time in the basement, the first place Taylor took SA Brooks was the basement.  (Tr. at 16-17).  SA Brooks explained that while he was with Taylor in the basement, SA Sedberry presented her with a written consent form, but Taylor declined to sign the form.  (Tr. at 20-21, 73-75).  However, she did not at any point tell the ATF agents to get out of the house; instead, she continued to show the agents around the house in a "casual manner," as she explained things and answered questions, and her demeanor did not change.  (Tr. at 21, 76, 107, 141).  She continued to be "friendly" toward the agents.  (Tr. at 107).

Specifically, SA Sedberry explained his interaction with Taylor in the basement, regarding the consent form, as follows:

> She was very cooperative.  She was assisting, you know, answering questions, whatever.  I walked up to her and I said, Ms. Taylor, I have a consent—I know you've given us consent.  I'd like to have you fill out a consent to search form, if that's okay with you.  And she said she didn't want to sign anything.  And I said, Well, you don't have to sign anything.  And once that happened, obviously red flags kind of go off in my head.  I'm like, but, wait a minute, you don't have to sign the consent to search, but we do still have consent to search your house.  I don't know what I said verbatim, but I know for a fact that I said, Do we still have your consent to search your house?  And she said, Yes.  And there were other agents kind of around in the basement, and I wanted them to hear that as well because I knew this could be an issue.  And so I said, Do we still have consent?  [And she said,] Yes, you do.  I have nothing to hide.

(Tr. at 390-91).  SA Sedberry made no threats or promises to Taylor during this exchange, and there was no physical intimidation of any sort, or signs of duress or confusion from Taylor.  (Tr. at 391-92).

Taylor then took the agents upstairs and showed SA Brooks two firearms that she and Reilly kept in their master bedroom.  (Tr. at 19).  They opened up a nightstand drawer on one side of the bed and Taylor showed SA Brooks a Glock pistol.  (Tr. at 19, 393).  Then they opened up the nightstand drawer on the other side of the bed, and Taylor showed SA Brooks a Kel-Tec pistol.  (Tr. at 19-20, 394).  Both drawers were opened with Taylor's permission.  (Tr. at 393-394).  Taylor led SA Brooks through the other bedrooms of the house; then the tour concluded in the garage.  (Tr. at 21-22).  While in the garage, TFO Griffin located two large packages of marijuana on a barbecue grill.  (Tr. at 22).  Taylor was "pretty upset" when this occurred.  (Tr. at 22).  SA Brooks advised a fellow agent

18

to put handcuffs on Taylor, and the decision was made to apply for a search warrant in order to complete the search of the house.  (Tr. at 22, 141).  SA Brooks did not question Taylor any further.  (Tr. at 23).

The evidence provided at the evidentiary hearing makes clear that Taylor provided the ATF with voluntary consent to search her residence, and re-affirmed that consent even after declining to sign the written consent to search form presented to her by SA Sedberry.  Under the totality of the circumstances analysis, the Eleventh Circuit has upheld similar consent searches in comparable situations.  *See, e.g., Johnston v. Tampa Sports Auth.*, 530 F.3d 1320, 1328 (11th Cir. 2008) (consent to search defendant's person voluntary because defendant not in custody, aware of his right to refuse pat-down, and only gave verbal objection to the search followed by submission to the pat-down search process); *United States v. Delancy*, 502 F.3d 1297, 1308 (11th Cir. 2007) (consent to search home voluntary where homeowner was aware there were drugs and assault rifle in house but consented to search to try to distance herself from illegal activity).

## C. Taylor's Consent to Search her Cell Phones

Taylor next asserts that the electronic evidence seized during the consent search of her two cell phones, which were searched electronically in the afternoon of March 19, 2014, on-site at 1901 Niskey Lake Road, should be suppressed because the consent that she gave to the investigating agents was not voluntary.  This claim is belied, however, by the oral consent that Taylor gave to SA Kosch.  And, in any case, the state search warrant authorizing search of Taylor's home also authorized the search of electronic devices within that residence, including her cell phones, which were in the garage area and were

19

searched after the state search warrant was signed.  Thus, consent to search Taylor's cell phones was not even required.

SA Steve Kosch was one of several ATF agents on scene at the Niskey Lake Road residence, on March 19, 2014, to assist with the firearms investigation of Reilly and Taylor.  (Tr. at 113-14).  SA Kosch has training in cellular forensics, and often conducts cell phone data extraction when asked to do so by case agents.  (Tr. at 112).  SA Kosch often uses a portable Cellebrite device, which he can carry with him in his vehicle to extract data from cell phones on scene.  (Tr. at 116).  When SA Kosch arrived at Reilly's and Taylor's house, shortly after SA Gabriel Brooks arrived around 2:00 p.m., SA Brooks gave SA Kosch the cell phones from Reilly and asked for them to be processed.  (Tr. at 6-7, 115).  That process took several hours, and when he was done SA Kosch returned the phones to SA Brooks.  (Tr. at 117).  Then, after the search of Reilly's phones were complete, SA Nick DeGennaro gave SA Kosch two phones from Taylor to process.  (Tr. at 117).  According to SA Kosch, this likely occurred after the state search warrant had already been signed, around 4:43 p.m.  (Tr. at 117, Gov't Ex. 4).

As TFO William Johnson explained, after the marijuana was located in the garage, he drafted up a search warrant affidavit for the Niskey Lake Road residence.  (Tr. at 141).  TFO Johnson presented his affidavit to Judge Woodson of Fulton County Superior Court, and it was signed at 4:43 p.m., about 2 hours and 43 minutes after the agents initially arrived at the residence.  (Tr. at 6-7, 141-42, Ex. 4).  The warrant authorized searching the residence at 1901 Niskey Lake Road, as well as "outlying structures/vehicles on the property or on the curtilage

of the property," and " electronic devices used for communication, electronic surveillance equipment, [and] electronic devices used for/derived from the sale of narcotics," which includes cell phones.  (Gov't Ex. 4).

Although the search warrant had already been signed, and it authorized the search of electronic devices on the premises of 1901 Niskey Lake Road, including cell phones, SA Kosch nevertheless asked SA DeGennaro about consent to the search Taylor's cell phones.  (Tr. at 117).  Because it was unclear to SA Kosch whether Taylor had already consented to the search her cell phones, SA Kosch confirmed with Taylor directly that she consented.  (Tr. at 118, 121, 133, 135).  SA Kosch testified, "I asked her if she had any problem with us searching her cell phones, and she gave verbal consent at that point."  (Tr. at 118).  SA Kosch further clarified, "I asked her specifically, Will you give me consent to search your phone.  She said Yes."  (Tr. at 135).  SA Kosch documented the consent received from Reilly and Taylor on the top-right corner of their cell phone acquisition forms.  (Tr. at 118-19, Exs. 2, 3).  SA Kosch then took Taylor's phones to his car, where he conducted the search using the Cellebrite device, and then returned the phones to SA DeGennaro.  (Tr. at 118, 136).

The testimony and evidence set forth at the evidentiary hearing demonstrate that the agents conducted a legally valid consent search of Taylor's cell phones; and in any case, the state search warrant that authorized search of electronic devices on the premises of the residence provided a separate basis for finding the search of Taylor's cell phones constitutionally valid.

**D. Taylor's Consent to Speak with Agents and *Miranda* Waiver**

Finally, Taylor asserts that the statements she gave to the agents in the afternoon and evening of March 19, 2014, at 1901 Niskey Lake Road, should be suppressed because she did not consent to speak to the agents initially, and later her waiver of her *Miranda* rights, after she was placed in handcuffs, was not knowing and voluntary. But this argument, like Taylor's other arguments, are contradicted by the evidence.

As noted above, in Section B, the testimony presented at the evidentiary hearing is clear that Taylor knowingly and voluntarily consented to speak with the agents when they initially approached her and as she took them through her house. This was true before and after Taylor was presented with, but declined to sign, the written consent to search form. As made clear by the testimony of SAs Brooks and Sedberry, Taylor asserted that in her view she had nothing to hide, and had no reason to not want to speak with the agents. There is no evidence to suggest that Taylor was not speaking with the agents voluntarily prior to her *Miranda* waiver.

Although the tenor of Taylor's interaction with the agents may have changed after the marijuana was discovered in the garage and she was placed in handcuffs (around 3:00 or 3:30 p.m.), her willingness and consent to speak with the agents did not change. (Tr. at 60). Prior to that point there had been no need to read Taylor her *Miranda* rights because she was not under arrest and she was free to leave. (Tr. at 97, 103). As SA Southall explained, Taylor "absolutely" agreed to speak with the agents when they first approached her on the driveway of her residence. (Tr. at 179). SA Southall testified, "[Taylor] said she would answer any questions we have. She wasn't combative. It was just an encounter.

22

I mean, she was fine to speak with us."  Taylor did not evade any questions, ask for a lawyer, or show any signs that she was feeling coerced or otherwise forced into speaking with the agents.  (Tr. at 179, 220).  As SA Southall explained, "She was free to leave.  I didn't impede her movements.  I just wanted to talk to her. She agreed to."  (Tr. at 219).

After Taylor showed the agents around her and Reilly's house, and after the marijuana was located in the garage, SA Sedberry, TFO Johnson, and TFO Earnest went to obtain a search warrant for the residence.  (Tr. at 396).  When they returned, likely around 5:30 p.m. or so, SA Sedberry observed Taylor in handcuffs sitting on a chair in the driveway area.  (Tr. at 396).  SA Sedberry then "went up to her and I asked her if anybody had read her her rights.  And she goes, No.  And at that time I obtained an advice of rights form, ATF advice of rights form, and read her her rights with Sergeant Ferguson as a witness."  (Tr. at 397, Gov't Ex. 7).

A defendant may waive his or her *Miranda* rights "provided the waiver is made voluntarily, knowingly and intelligently." *Miranda v. Arizona,* 384 U.S. 436, 444 (1966).  The waiver inquiry is two-pronged.  "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986).  Relevant here, "[a]n express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either

necessary or sufficient to establish waiver." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *see also United State v. Beckles*, 565 F.3d 832, 840 (11th Cir. 2009).

SA Sedberry further explained the *Miranda* form as follows:

> Her initials are beside each right as I explained them to her. And I—what I do when I read this, I ask people, you know, if they can read and write. And then I'll say I'll read it, please read along with me to yourself. And I read the waiver, and then there is a signature here where I saw Ms. Taylor write her signature waiving her right, and then witnessed by Sergeant Ronnie Ferguson, and then my—where I date and time the form.

(Tr. at 397-98, Gov't Ex. 7). Taylor's written *Miranda* waiver is dated 3/19/14 at 5:43 p.m. (Tr. at 398-99, Gov't Ex. 7). On cross-examination, SA Sedberry made clear that there were no meaningful statements by Taylor between the time Taylor was handcuffed and the time she was read and waived her *Miranda* rights. (Tr. at 413-15). The evidence shows that Taylor's *Miranda* waiver was valid, and thus her statements given after the time of her handcuffing should not be suppressed.

## E.  Reilly's Consent to Search his Cell Phones

Reilly claims that the electronic evidence seized during the searches of his three cell phones should be suppressed because his consent for those searches was not given voluntarily, and thus the later search, pursuant to a federal search warrant, was derivatively tainted as well. However, as described below, SA Gabriel Brooks's testimony made clear that Reilly voluntarily consented to the search his phones, and even gave the agents the required passcode to access them.

24

On March 19, 2014, around 2:00 p.m., as the agents were arriving at 1901 Niskey Lake Road, SA Brooks got out of his car and approached Reilly on the driveway. (Tr. at 13). Reilly had exited the white BMW and had walked halfway up the driveway toward the agents. (Tr. at 8). SA Brooks was in street clothes, and there were no lights or sirens. (Tr. at 9). As SA Brooks approached Reilly, he displayed his ATF credentials and identified himself as police. (Tr. at 9, 51). SA Brook's firearm was holstered. (Tr. at 9). SA Brooks had an initial, brief conversation with Taylor, near the garage, as described above in Section B. (Tr. at 12-13). Then SA Brooks turned back and re-approached Reilly, who by then had started talking with SAs Jon Gray and Jon Judkins on the driveway. (Tr. at 13). SA Brooks explained as follows:

> I asked Agent Judkins if they had—if they obtained consent for the phone, for [Reilly's] phones, because I see that there's phones either in his hands or laying next to his feet . . . . They hadn't asked about the phones, so I just went ahead and asked Mr. Reilly about the phones . . . . I asked him if they were his, and he said Yes. . . . I asked for consent to search the phones. He said Yes. And they—I think two were iPhones, and then like they were all smart phones, so they had [security] codes. [Reilly] gave me the codes in order to unlock the phones. So I took the phones and went to Agent Kosch, who is the guy, Cellebrite phone dump system, to just dump [*i.e.*, extract data] from the phones.

(Tr. at 13-14).

Reilly was "calm" and "casual" during this conversation, and SA Brooks did not make any promises or threats when he asked Reilly for consent to search his phones. (Tr. at 14, 50). SA Gray was also present during this conversation, and testified that SA Brooks "asked [Reilly] if he could look at his phones. And Mr. Reilly said, Yeah, go ahead. Agent Brooks then asked what the passcodes were

for the three phones, which Mr. Reilly provided, and then Agent Brooks stepped away." (Tr. at 356-57).

SA Brooks then gave Reilly's three cell phones to SA Kosch for processing, and told SA Kosch that he had consent from Reilly to search the phones. (Tr. at 115, 123-24). SA Kosch took the phones to his vehicle where he processed the phones using the Cellebrite device. (Tr. at 115). For Reilly's iPhone that required a pass code, SA Kosch noted the PIN number that Reilly had given to SA Brooks on the mobile acquisition form, labeled "N Force #0001,"under the field entitled "Known/Recovered PIN." (Tr. at 122-123, 127-28; Gov't Ex. 2).[9]

The evidence shows that the agents' search of Reilly's cell phones were constitutionally valid based on his voluntary consent. In circumstances much more stressful than those faced by Reilly, the Eleventh Circuit has repeatedly affirmed comparable consent searches, deeming them voluntary. *See, e.g., United States v. Hidalgo*, 7 F.3d 1566 (11th Cir. 1993) (upholding defendant's consent search even though it followed immediately after his arrest at gun-point and his invocation of his right to remain silent); *United States v. Freyre-Lazaro*, 3 F.3d 1496 (11th Cir. 1993) (consent found to be voluntary even though person giving

---

[9] Later, on May 30, 2014, SA Sedberry swore out an affidavit supporting a federal search warrant application requesting authorization to search several electronic devices, including two computers, one thumb drive, and five cell phones, seized from the premises at 1901 Niskey Lake Road on March 18, 2014, pursuant to the defendants' consent and/or the March 19, 2014 state search warrant. (Tr. at 400-403, Gov't Exs. 5, 6). The reason the government sought authorization to search the five cell phones, even though they had already been searched on-site the day of Reilly's arrest, was because the on-site search did not capture all the potential data that could be retrieved during a full-blown search in a forensic lab. (Tr. at 403-404).

consent had just seen police arrest her son); *United States v. Garcia*, 890 F.2d 355 (11th Cir. 1989) (consent was free and voluntary even though defendant had just been arrested outside his home by 14 agents, and when he tried to consent to a search of only part of his house, agents said that was unacceptable and they would be required to obtain a warrant); *United States v. Espinosa-Orlando*, 704 F.2d 507 (11th Cir. 1983) (consent to search defendant's car and suitcase was free and voluntary when defendant was lying face down in the grass near a roadway; three police had just re-holstered their guns, and the fourth was still brandishing his weapon).

## F.  Reilly's Consent to Speak with Agents and *Miranda* Waiver

Finally, although Reilly has not squarely raised the issue of whether he knowingly and voluntarily consented to speak with the agents when approached by them in his driveway on March 19, 2014, the testimony of SA Jonathan Gray made clear that Reilly's initial consent was knowing and voluntary, and his subsequent *Miranda* waiver after his handcuffing was similarly knowing and voluntary.

SA Gray testified that, after some preliminary conversation between SA Jon Judkins and Reilly on the driveway of 1901 Niskey Lake Road, which SA Gray observed, SA Judkins asked to see Reilly's identification.  (Tr. at 335-337). Shortly after SA Judkins was presented with several false identifications, the decision was made, around 2:20 p.m., to place Reilly in handcuffs, at which time SA Gray observed SA Judkins advise Reilly of his *Miranda* rights by reading those rights verbatim from SA Judkins's *Miranda* card.  (Tr. at 338-342, 344-345, 361, 363).  Reilly orally agreed to waive his rights and consented to speak with

the agents.  (Tr. at 342-343).  The evidence makes clear that Reilly consented to speak with agents freely and voluntarily.  (Tr. at 343-344, 346-347).

## III.   CONCLUSION

The government submits that the testimony at the evidentiary hearings in this matter demonstrate, as outlined above, that none of the arguments asserted in the defendants' suppression motions have merit, and thus those motions should be denied.

On this 12th day of February, 2015.

Respectfully submitted,

JOHN A. HORN
    *Acting United States Attorney*


/s/JOHN S. GHOSE
    *Assistant United States Attorney*
    Georgia Bar No. 446568
    john.ghose@usdoj.gov

WILLIAM G. TRAYNOR
    *Assistant United States Attorney*
    Georgia Bar No. 716634
    william.traynor@usa.doj.gov

600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404-581-6000
Fax: 404-581-6181

<u>CERTIFICATE OF SERVICE</u>

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the following parties and counsel of record.

Steven Howard Sadow

*Attorney for Defendant Deshawn Reilly*

steve8300@mindspring.com

Dwight Lowell Thomas

*Attorney for Defendant Curel Taylor*

dwightl654@gmail.com

February 12, 2015

/s/ JOHN S. GHOSE

JOHN S. GHOSE

*Assistant United States Attorney*