UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DESHAWN REILLY and CUREL TAYLOR | CRIMINAL CASE NO.<br>1:14-CR-146-ODE-GGB |

## REPORT AND RECOMMENDATION

Defendants Deshawn Reilly and Curel Taylor are charged in a superseding indictment with making a false statement on a Firearms Transaction Record (ATF Form 4473) that Ms. Taylor was the buyer of certain firearms when, in fact, she was not the true purchaser. (Doc. 30, Count One, "Straw Purchase of a Firearm"). Defendant Reilly is also charged with possession of firearms by a convicted felon (Counts Two and Three), and possession of marijuana with the intent to distribute (Count Four).

Pending before the Court are motions to suppress filed by Defendant Reilly (Docs. 23, 49) and Defendant Taylor (Doc. 46). Evidentiary hearings on these motions were held before the undersigned magistrate judge on August 21, 2014 (Doc. 64, Vol. 1, pages 1-226) and October 24, 2014 (Doc. 68, Vol. 2, pages 227-426) (referenced hereinafter collectively as "Tr. ___").

AO 72A
(Rev.8/82)

For the reasons discussed below, I recommend that all of the Defendants' motions to suppress be denied. I defer to the district court the Motion for Medical Continuance (Doc. 92) filed by Defendant Taylor's counsel.

## I. FACTS

On March 14, 2014, an employee at the Arrowhead Pawn Shop ("Arrowhead") in Jonesboro, Georgia called Bureau of Alcohol, Tobacco and Firearms ("ATF") Special Agent ("SA") Benjamin Southall to notify him that a woman (Defendant Taylor) was attempting to buy two identical FN Model Five Seven pistols while accompanied by three other people. These weapons were expensive, high-powered pistols that shoot rifle rounds. (Tr. 169, 232-33, 255, 264-65, 374). SA Southall passed the information he received on to ATF SA Chuck Sedberry. (Tr. 370-71). In SA Sedberry's experience, it is common for a woman to be a straw purchaser for a man who is prohibited from buying guns. (Tr. 373). Adding to his suspicion, SA Sedberry learned that a handgun that Ms. Taylor had purchased elsewhere had recently been recovered by law enforcement in Fairburn, Georgia. (Tr. 376).

On March 17, 2014, an Arrowhead employee called Ms. Taylor and left a message for her that her background check was complete and she could come to the store to finalize the purchase of her guns. (Tr. 172). A few minutes later, when Ms. Taylor called back, the store's caller I.D. showed that she was calling from a phone

2

line subscribed to by Deshawn Reilly. (Tr. 173, 192-93). SA Sedberry ran a criminal background check on Mr. Reilly and found out that he was a convicted felon and therefore prohibited by federal law from purchasing firearms. (Tr. 172-73, 379).

On March 19, 2014, special agents Southall and Sedberry received a call from a different Arrowhead employee who said that Ms. Taylor was in the store with another individual, later identified as Deshawn Reilly. (Tr. 173). The Arrowhead employee told SA Southall that Ms. Taylor was purchasing an FN pistol and a shotgun, and that Mr. Reilly had picked out the shotgun to be purchased. (Tr. 174). The employee said that Ms. Taylor and Mr. Reilly would be walking out of the store with the pistol in a white plastic bag and the shotgun in a white and blue box. (Tr. 175).

Special agents Southall and Sedberry began surveillance and saw Ms. Taylor and Mr. Reilly leave the store with Ms. Taylor carrying the white bag and Mr. Reilly carrying the blue and white shotgun box. (Tr. 176-77). Several agents, including Southall, Sedberry, Brooks, Gray, and Judkins, followed Defendants' car, a BMW, to their house at Niskey Lake Road. The BMW stopped when it was halfway into the garage. (Tr. 7, 333, 388).

SA Brooks got out of his car and approached Defendants while displaying his ATF credentials. (Tr. 8). Mr. Reilly got out of the car and walked up the driveway towards the street. Ms. Taylor also got out of the car, but remained close to the trunk

area. (Tr. 9). Mr. Reilly approached the agents at the end of his driveway and asked them what was going on. (Tr. 335-36). At least two of the agents observed that Mr. Reilly was wearing a sweatshirt with a large bulge in the front pocket. SA Judkins ordered Mr. Reilly to stop moving and to show his hands. (Tr. 336). Mr. Reilly complied with these orders. SA Judkins asked Mr. Reilly if he had any weapons on him, and Mr. Reilly stated, "No, they're in the house." (Defendant Ex. 3, ¶ 2). SA Judkins then patted Mr. Reilly down for weapons. (Tr. 336).

Agents removed from Mr. Reilly's front sweatshirt pocket three cellular telephones, a set of keys, some bank paperwork, and his wallet. (Tr. 337). The agents told Mr. Reilly that he was not under arrest but that he was being detained with regard to a criminal investigation that ATF was conducting. (Tr. 340; Def. Ex. 3, ¶ 3). The agents asked Mr. Reilly for identifying information. He provided his name, date of birth, social security number, and address. He told them that he had a Pennsylvania identification card in his wallet and that the agents could go into his wallet and retrieve it. (Tr. 337, 362; Def. Ex. 3, ¶ 3).

Agents found several identification documents in Mr. Reilly's wallet, two of which contained Mr. Reilly's photograph, but a different name and different state of issuance (Alabama and California). (Tr. 338-40). Mr. Reilly gave the agents additional information relating to his residence, his travel with Ms. Taylor, Ms. Taylor's residence,

4

his and Ms. Taylor's cell phone numbers, the owners of the cell phones in his pocket, his business, his previous arrests, and his military history. (Def. Ex. 3, ¶¶ 3-6).

SA Judkins then placed Mr. Reilly in handcuffs and again told him that he was not under arrest but was still being detained during ATF's criminal investigation. SA Judkins then read Mr. Reilly his <u>Miranda</u> rights. Mr. Reilly acknowledged that he understood his rights and was willing to speak with the agents. (Tr. 341-45; Def. Ex. 3, ¶ 8). The agents then conducted a lengthy interview of Mr. Reilly. (Tr. 345-46; Def. Ex. 3, ¶¶ 9-43).

Once SA Brooks confirmed that Mr. Reilly was not armed, Brooks proceeded up the driveway toward the open garage to talk with Ms. Taylor who was still standing at the rear of her car. When SA Brooks reached Ms. Taylor, he identified himself to her as an ATF agent. (Tr. 10). Brooks asked Ms. Taylor about the guns. (Tr. 11). She told him that she had purchased a pistol and a shotgun, but she did not know the caliber or gauge of the guns. (Tr. 11-12). SA Brooks then left Ms. Taylor temporarily to speak with other ATF agents who were arriving on the scene. (Tr. 12-13). Brooks had a brief conversation with Mr. Reilly in which Mr. Reilly confirmed that he had a prior felony conviction for a marijuana offense. (Tr. 15).

Brooks then returned to Ms. Taylor, who said that she "wanted to know what was going on." (Tr. 15). He told her that Mr. Reilly was a convicted felon and that he had

5

just been seen carrying a shotgun box out of a gun store. (Tr. 15-16). Brooks asked Ms. Taylor who lived in the Niskey Lake Road house, and Ms. Taylor responded that Mr. Reilly stayed there sometimes, but he also spent time in other states. (Tr. 16).

Brooks then asked Ms. Taylor if "we could search the house with her there, with her walking through with us in the house." (Tr. 16). Ms. Taylor told Brooks that she had two other firearms inside the house. Brooks told her that he would like to see those firearms. Ms. Taylor then agreed to take the agents through the house and allow them to search the house. (Tr. 16, 388). Agents asked Ms. Taylor questions, which she answered, during the walk-through of the house. (Tr. 21-22; Def. Ex. 4).

Brooks began his search in the basement. While he was with Ms. Taylor in the basement, SA Sedberry presented Ms. Taylor with a written consent-to-search form. Ms. Taylor declined to sign the form. (Tr. 20-21, 73-75). However, she reconfirmed, and did not revoke, her oral consent. (Tr. 20-21, 390-91).

Ms. Taylor then took the agents upstairs and showed them two firearms that were kept in the master bedroom. With Ms. Taylor's permission, the agents opened up nightstand drawers on both sides of the bed. Each drawer contained a pistol. Ms. Taylor then led the agents through other bedrooms of the house and then to the garage. (Tr. 21-22). While in the garage, Task Force Officer Griffin located two large packages of marijuana in a barbecue grill. (Tr. 22). An agent then placed handcuffs on

6

Ms. Taylor. The agents decided to apply for a search warrant to complete the search of the house. (Tr. 22, 141). Agents did not further question Ms. Taylor until after the search warrant was obtained and she was given Miranda warnings. (Tr. 23).

At 4:43 p.m. on March 19, 2014, William Johnson, an Atlanta Police detective and ATF task force officer, applied for and obtained from a Fulton County Superior Court Magistrate Judge a search warrant for 1901 Niskey Lake Road, S.W. The application was for a warrant to search for evidence of violations of the Georgia Controlled Substances Act. (Tr. 137; Gov't Ex. 4). The application was based in part on items that had been found in the house during the search earlier conducted pursuant to Ms. Taylor's consent. (Gov't Ex. 4). The warrant authorized law enforcement officers to search for, among other things, electronic devices. (Id.).

During the search pursuant to the warrant, agents found numerous incriminating items, including heat sealers, a vacuum sealer, packaging materials, money counters, and a scale. (Tr. 400).

After the search warrant was obtained, SA Sedberry approached Ms. Taylor who was then in handcuffs sitting on a chair in the driveway area. Sedberry obtained an advice-of-rights form and read Ms. Taylor her Miranda rights. (Tr. 396-99; Gov't Ex. 7). Ms. Taylor initialed each paragraph of the form and signed the waiver at the bottom of the form under the pre-printed statement:

7

> I have read this statement of my rights or it has been read to me, and I understand these rights.  At this time I am willing to answer questions without a lawyer present.  No promises or threats have been made to me, and no pressure or force of any kind has been used against me.

(Gov't Ex. 7).  Agents interviewed Ms. Taylor after she waived her rights.  (Def. Ex. 4, ¶¶ 44-49).

SA Brooks gave Mr. Reilly's three cell phones to SA Kosch for processing, and told SA Kosch that he had consent from Mr. Reilly to search those phones.  (Tr. 115, 123-24).  Kosch used a "Cellebrite" device to extract data from Mr. Reilly's cell phones on the scene.  (Tr. 116).  That process took several hours.  (Tr. 117).

After the search of Mr. Reilly's phones was completed, SA DeGennaro gave Kosch two phones from Ms. Taylor to process.  To make sure that he had authority to search Ms. Taylor's cell phones, Kosch asked Ms. Taylor if she had any problem with the officers searching her cell phones, and Ms. Taylor gave Kosch verbal consent to search her phones.  (Tr. 118, 135).  Ms. Taylor's consent to search her cell phones was probably given after the search warrant was obtained. (Tr. 117).  Kosch then searched Ms. Taylor's phones using his Cellebrite device.  (Tr. 118, 136).

On May 30, 2014, SA Sedberry applied for and received a federal search warrant to search several electronic devices, including computers and cell phones seized from the Niskey Lake Road residence on March 18, 2014.  (Gov't Exs. 5, 6).  The government sought authorization to search the cell phones even though they had already

8

been searched on-site because the on-site search had not captured all of the potential data that could be retrieved during a search in a forensic laboratory. (Tr. 403-04; Gov't Exs. 5,6).

Additional facts are discussed in context below.

## II. DISCUSSION

Both Defendants were given an opportunity to file briefs after the hearings on the motions to suppress. Ms. Taylor filed a brief (Doc. 86), which Mr. Reilly adopted (Doc. 87). Mr. Reilly did not file a separate brief.

The arguments raised in Ms. Taylor's brief are: (1) agents entered Ms. Taylor's premises unlawfully; (2) there was no reasonable suspicion to justify an investigative detention of Ms. Taylor; (3) agents initially made a de facto arrest of Ms. Taylor rather than an investigative stop; (4) Ms. Taylor did not knowingly and voluntarily consent to a search; (5) any consent by Ms. Taylor was revoked when she refused to sign the consent form; and (6) agents took Ms. Taylor's cell phones from her purse before obtaining her consent. These arguments are addressed below and rejected. In addition, I find that any statements made by Mr. Reilly and Ms. Taylor were voluntary and any of their custodial statements were voluntarily made after they were given Miranda warnings.

9

**A.     Agents lawfully approached Ms. Taylor in her driveway.**

Ms. Taylor is apparently arguing that the agents unlawfully approached her in her driveway to speak with her.

A Fourth Amendment search occurs when the government invades an area in which a person entertains a legitimate or justifiable expectation of privacy. Rakas v. Illinois, 439 U.S. 128, 143 & n.12, 99 S. Ct. 421, 430 & n.12 (1978); Katz v. United States, 389 U.S. 347, 353, 88 S. Ct. 507, 512 (1967); Terry v. Ohio, 392 U.S. 1, 9, 88 S. Ct. 1868, 1873 (1968). Courts have recognized that no Fourth Amendment search occurs when police officers come onto private property to conduct an investigation and restrict their movements to places that visitors could be expected to go, such as walkways or driveways. 1 Wayne R. LaFave, Search and Seizure § 2.3(f) at 784 nn. 228, 229 (5th ed. 2012) (collecting cases); see also United States v. Ventling, 678 F.2d 63, 66 (8th Cir. 1982) (no legitimate privacy expectation in residential driveway accessible to and from public highway); United States v. Cota-Lopez, 358 F. Supp. 2d 579, 591-92 (W.D. Tex. 2002) (finding that officers' entry into an open garage attached to the residence to conduct "knock and talk" with resident did not violate the Fourth Amendment).

AO 72A
(Rev.8/82)

In sum, the agents did not violate Ms. Taylor's Fourth Amendment rights by approaching her because she had no expectation of privacy while she was standing in her driveway outside of her open garage.

**B.      Agents had reasonable suspicion for an investigative detention of Ms. Taylor.**

The question next becomes whether the agents' conduct after they approached Ms. Taylor violated Ms. Taylor's Fourth Amendment rights.

There are three categories of police-citizen encounters for purposes of analyzing whether evidence derived from such an encounter was obtained in violation of the Fourth Amendment:  (1) police-citizen communications involving no coercion or detention; (2) brief seizures or investigative detentions that must be supported by reasonable suspicion; and (3) full-scale arrests that must be supported by probable cause. United States v. Espinosa-Guerra, 805 F.2d 1502, 1506 (11th Cir. 1986); United States v. Berry, 670 F.2d 583, 591 (5th Cir. Unit B 1982) (en banc).  The government relies on the second category of encounter – investigative detentions supported by reasonable suspicion – to support the agents' interaction with Ms. Taylor after they approached her in her driveway. (Doc. 75 at 9-10).  Law enforcement officers may briefly detain an individual for purposes of investigating a crime if they have a reasonable, articulable suspicion based on objective facts that the individual has

11

engaged in, or is about to engage in, criminal activity. Terry, 392 U.S. at 33, 88 S. Ct. at 1886.

Here, the agents collectively knew that: (1) Ms. Taylor had initially entered a store with two or three men and one other woman and wanted to purchase identical, expensive, high-powered pistols; (2) the store employee observed that one of the men accompanying Ms. Taylor was taking an active role in the purchase; (3) Ms. Taylor later called the store from a phone line that was registered to Mr. Reilly, a convicted felon; (4) when Ms. Taylor returned to the store, Mr. Reilly picked out a shotgun for her to purchase; (5) Ms. Taylor picked up her guns accompanied by Mr. Reilly, who carried the shotgun box out of the store; and (6) on a previous occasion, Ms. Taylor had purchased a gun that had been recovered by law enforcement.

It is an unlawful "straw purchase" for an individual to buy a gun for a convicted felon. See Adventure Outdoors, Inc. v. Bloomberg, 552 F.3d 1290, 1293 (11th Cir. 2008) (explaining that straw purchase transactions "involve the purchase of a firearm by an individual legally eligible to make the purchase (the straw) with intent to immediately transfer the gun to someone who is ineligible to purchase the weapon (the actual purchaser)."). The articulable facts listed above clearly gave the agents a reasonable belief that Ms. Taylor was purchasing at least one firearm for Mr. Reilly,

who was ineligible to possess guns because he was a convicted felon. Therefore, the agents were authorized to conduct an investigatory detention of Ms. Taylor.

C. **Ms. Taylor voluntarily consented to a search of her residence and phones, and did not revoke her consent when she refused to sign the consent form.**

Ms. Taylor argues that the evidence seized by the ATF agents during the walk-through of her home at Niskey Lake Road should be suppressed because she did not voluntarily consent to a search. She contends that any oral consent was revoked when she refused to sign the consent form. However, as set forth above, the evidence is undisputed that Ms. Taylor orally consented and reaffirmed her consent to SA Sedberry even after she declined to sign the written consent form. See United States v. Boon San Chong, 829 F.2d 1572, 1574 (11th Cir. 1987) (refusing to sign waiver and refusal to make a written confession does not mean an oral waiver was ineffective). The evidence is also undisputed that Agent Kosch asked Ms. Taylor if she had any problem with the officers searching her cell phones, and Ms. Taylor gave Kosch verbal consent to search her phones.

Where the validity of a search rests on consent, the government has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given. Florida v. Royer, 460 U.S. 491, 497, 103 S. Ct. 1319, 1324 (1983). The government also bears the burden of proving that the consent was not a mere submission

13

to a claim of lawful authority. Id. The government sustains its burden by proving voluntariness by a preponderance of the evidence. United States v. Matlock, 415 U.S. 164, 178 n.14, 94 S. Ct. 988, 996 n.14 (1974). In deciding whether the government has met its burden, this Court must consider the totality of the circumstances. Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S. Ct. 2041, 2047 (1973). "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989).

Considering the totality of the circumstances, I find that Ms. Taylor voluntarily consented to a search of her home.

**D.    Ms. Taylor was not arrested until she was placed in handcuffs.**

Ms. Taylor argues that she was subjected to a de facto arrest before she was given Miranda warnings, and, therefore, her un-Mirandized statements should be suppressed.

At some point in an investigative process, a stop may became a full-scale arrest because of the scope and intrusiveness of the officer's conduct. Berkemer v. McCarty, 468 U.S. 420, 440, 104 S. Ct. 3138, 3150 (1984) ("It is settled that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action is curtailed to a degree associated with formal arrest") (internal quote marks and citation omitted). Ms. Taylor points to the facts that five or six agents approached her in her driveway, Agent Brooks had his hand on his weapon, and she was not advised that she

14

was free to leave or to decline to talk to the agents. However, some restriction of freedom of movement alone is not sufficient to transform an investigative stop into a de facto arrest. United States v. Acosta, 363 F.3d 1141, 1147 (11th Cir. 2004). Similarly, an investigatory stop does not necessarily ripen into an arrest because an officer draws his weapon. Id.

Considering the totality of circumstances, Ms. Taylor's freedom of action was not curtailed to a degree associated with formal arrest until she was placed in handcuffs. Ms. Taylor was given Miranda warnings after she was placed in handcuffs and before any further questioning. Therefore, Ms. Taylor's statements are not subject to suppression on the ground that she was arrested and questioned before she received Miranda warnings.

E.  **The search warrant was not the fruit of an unlawful seizure.**

As discussed above, the law enforcement agents did not violate the Fourth Amendment before obtaining a search warrant. Therefore, the search warrant obtained from the Fulton County Magistrate Judge was not the fruit of an unlawful seizure.

F.  **Ms. Taylor's cell phones were not searched until after her arrest, after the search warrant was obtained, and after she consented to their search.**

Ms. Taylor argues that agents took her cell phones from her purse while she was in custody before the search warrant arrived, without her consent, and gave them to

15

Agent Kosch to search. (Doc. 86 at 2). The evidence is not clear on how and when agents initially obtained Ms. Taylor's cell phones. However, even if the agents took Ms. Taylor's cell phones while she was in custody, Ms. Taylor was lawfully arrested, and agents are permitted to seize cell phones pursuant to a lawful arrest. See Riley v. California, ___ U.S. ___, 134 S. Ct. 2473, 2486 (2014) ("Both Riley and Wurie concede that officers could have seized and secured their cell phones to prevent destruction of evidence while seeking a warrant. That is a sensible concession."). Agents did not search the cell phones until after Agent Kosch had obtained Ms. Taylor's consent. Also, the search warrant, which was probably obtained before the search of the phones, authorized the search of electronic devices on the premises of 1901 Niskey Lake Road, including cell phones. Therefore, the seizure and search of Ms. Taylor's cell phones were lawful.

**G.  All custodial statements made by both Defendants were voluntarily made and preceded by *Miranda* warnings.**

Considering the totality of circumstances, I find that the statements of both Defendants were voluntarily made and any of their custodial statements were made after Miranda warnings were given and waived.

### III.  CONCLUSION

For the reasons discussed above, I **RECOMMEND** that the motions to suppress filed by Defendant Reilly (Docs. 23, 49) and Defendant Taylor (Doc. 46) be **DENIED**.

16

There are no pending matters before me, and I am aware of no problems relating to the scheduling of this case for trial other than the following: Counsel for Ms. Taylor has filed a Motion for Medical Continuance. (Doc. 92). This motion is deferred to the district court. Other than counsel's possible need for a medical continuance, it is **ORDERED AND ADJUDGED** that this action be declared **READY FOR TRIAL**.

**IT IS SO RECOMMENDED**, this 4th day of June, 2015.

                                                                            *Gerrilyn G. Brill*
                                                                            GERRILYN G. BRILL
                                                                            UNITED STATES MAGISTRATE JUDGE